Gerald ABDUL WALI, 81-A-5803; LeMoine Arrington, 81-B-981, Kuwasi Balagoon, 83-A-6216; Abdul Beyah, 79-A-137; Theodore Churakos, 82-C-889; Carlos Cortes, 80-B-523; Charles Culhane, 667-A-0065; Frederick Curl, 77-C-687; Kasiem Dodell, 83-A-783; Mujahid Farid, 79-A-0362; Raymond Fernandez, 81-A-2686; Ronald Fox, 82-A-2445; Carlos Gonzalez, 76-A-2277; Charles L. Harris, 81-C-470; Kenneth Johnson, 79-C-575; Jory Lowrence, 77-A-3323; Anthony McBaine, 79-B-1261; Edward McCleary, 80-B-1598; Kevin Richardson, 80-A-3080; Lamarr Rowell, 81-C-738; Sonny Viele, 77-C-95; David Sealy, 81-A-4049; Jose Vazquez, 77-A-4295 and Albert Washington, 77-A-1528, Plaintiffs-Appellees,

v.

Thomas A. COUGHLIN, III, Commissioner, Department of the New York State Department of Correctional Services; and Harold J. Smith, Superintendent of the Attica Correctional Facility, in their official and individual capacities, Defendants-Appellants.

No. 693, Docket 84-2387.

United States Court of Appeals,
Second Circuit.

Argued Dec. 12, 1984.

Decided Feb. 5, 1985.

Ellen M. Yacknin, Prisoners' Legal Services of New York, Buffalo, N.Y. (Joseph Kelemen, David C. Leven, Buffalo, N.Y., on the brief), for plaintiffs-appellees.

Martin A. Hotvet, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, and Robert Hermann, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.

Before KAUFMAN, TIMBERS and ROSENN *, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The Sisyphean task of maintaining order in our nation's prisons has, in recent times, been discharged with diligence and industry. Those men and women charged with the daily control of these most volatile of institutions have done much to bring them up to the standards expected of a civilized society approaching the end of the twentieth century. It cannot be gainsaid that much remains to be done before we can rest. Neither can it be denied that many

* Honorable Max Rosenn, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

beneficial changes have been effected by the courts over the vigorous objections of corrections officials. By and large, however, the gains made in the safe and efficient administration of our prisons may be attributed to the anonymous professionals who daily toil at the cutting edge of our efforts to improve, while at the same time securing, our penal institutions.

As in all endeavors, prison guards and administrators develop great expertise during the course of their careers. Just as experienced physicians render diagnoses on the basis of symptoms they sense, but often cannot empiricize or articulate, so too, we are told, can those who work among prisoners develop "senses" concerning the potential for impending disobedience or unrest.

In the great majority of cases, it would be sheer folly for society to deny prison officials the discretion to act in accordance with their professional judgment. At the same time, it would be an abrogation of our responsibility as judges to assume (or, more precisely, to reassume) a "hands off" posture, requiring categorical acquiescence in such judgments. Where an inmate alleges that precious constitutional rights are being abridged, the judiciary has the power, and indeed the duty, to intervene in the internal affairs of a prison. Balancing the wisdom of judicial deference against the need for courts to involve themselves in preserving precious liberties is a task of inordinate difficulty. But face it we must if we are to discharge our arduous and delicate duty as protectors and defenders of the Constitution.

Today, we consider a claim that the State of New York impermissibly interfered with the rights of inmates to receive copies of a report detailing conditions within a prison. The abstract rights embodied in our Great Charter acquire meaning only by reference to the mundane realities of human experience. Accordingly, we find it necessary to describe the facts giving rise to this dispute in some detail. By doing so, we hope to clarify the legal discussion that follows.

## I. BACKGROUND

Attica Correctional Facility is a maximum security prison in upstate New York. In September 1971, an uprising at the institution resulted in the deaths of forty-three persons—thirty-two inmates and eleven correctional employees. In the words of the Special Commission appointed by the Governor to investigate the incident: "[T]he State Police uprising which ended the four-day prison uprising was the bloodiest one-day encounter between Americans since the Civil War." *Attica: The Official Report of the New York State Special Commission on Attica* xi (Bantam Books ed. 1972) [hereinafter cited as "1972 Attica Report"].

In the aftermath of the riot, the very word "Attica" became symbolic of all that was wrong with America's maximum security prisons. Many observers expressed little surprise at the fact the riot had occurred; their only shock was at its not having happened earlier. The Report of the Special Commission set forth the conditions giving rise to the events of September 1971 in horrifying detail. We need not recount all those disturbing facts here. It is enough to say the Attica of 1971 was a squalid, degrading and dangerous place for convicts and guards alike. The prison's physical plant was vastly overtaxed. Built to house some 1700 inmates, the facility was then home to more than 2200. Emphasis was placed not on rehabilitation, but only on confinement and security. There were no meaningful educational or vocational training programs; idleness became the prisoners' principal occupation. An all-white staff of correction officers ruled an inmate population that was fifty-four per cent black and nine per cent Puerto Rican. Levels of personal hygiene and available medical care were scandalously low.

It would be comforting to believe that Attica was somehow different—that it was an exceptionally bad institution. Perhaps its archaic architecture was somehow to blame. After all, the thirty-foot-high wall and endless rows of six-foot by nine-foot by seven-foot cells were designed in another

era. Or perhaps the tensions in Attica were the result of inner-city criminals being policed by officials familiar only with the rural life of northern New York State. The sad truth, however, was that the Attica of 1971 was little better or worse than other maximum security prisons of that time. That the riot broke out there had more to do with chance than with any idiosyncrasy of the particular institution. The words of the Special Commission made it hauntingly clear: "Attica is every prison; and every prison is Attica."

We recite these sad facts of our recent history not to suggest that the situation at Attica has remained unchanged in the thirteen years since the bloody uprising, but rather to emphasize the institution's history of tension and violence. Indeed, we are given to believe that some beneficial innovations have been effected since that time, although it appears that by 1982, much remained to be done.

*The 1982 Report*

On the tenth anniversary of the publication of the Report of the Special Committee on Attica, a private organization called the Correctional Association of New York issued a document titled *Attica 1982: An Analysis of Current Conditions in New York State Prisons* ("1982 Report"). The report, which was but one of many on the subject of that much studied institution, was highly critical of the prison's administration and the Department of Correctional Services. It began with the words: "There is a crisis in New York's prisons," and went on to describe many problems existing within the prison at that time. Comparing the situation to that prevailing a decade earlier, the report concluded:

> While some improvements have occurred, in numerous areas our conclusions about inadequate, even dangerous, conditions echo those made ten years ago; there has been little improvement in the basic quality of life for prisoners and personnel, and little reduction in the underlying tension and frustrations that led to the uprising.

1982 Report at 3, *reprinted in* Joint Appendix ("J.A.") at 276.

Somewhat predictably, the 1982 Report angered prison officials, spawning a prompt and vigorous response. Thomas A. Coughlin III, then as now Commissioner of the New York State Department of Correctional Services ("DOCS"), issued a press release in which he characterized the document as "misleading and irresponsible," and stating that its description of conditions "simply isn't true." J.A. at 309. Along with the press release, Coughlin distributed a thirty-two page "reply," taking issue with many of the Report's factual statements, as well as its conclusions.

Both the 1982 Report and Coughlin's reply were reported widely in the press, and generated a great deal of interest throughout New York State. As might be expected, among those individuals most anxious to see copies of the study so critical of conditions at Attica were inmates of that institution. Notwithstanding his displeasure at its contents, Coughlin allowed the document to be delivered to prisoners at Attica and other maximum security prisons.

*The 1983 Prisoner Strike*

Beginning on September 19, 1983, approximately 1700 of the 2100 prisoners then incarcerated at Attica began a sit-in strike at the facility. They refused to report to their work stations or educational programs, and published a letter listing grievances. The prison was immediately secured and the entire population was confined in their cells around the clock. In the days following, the superintendent of the institution met with representatives of various prisoner organizations with the specific goal of identifying strike leaders, and more generally to collect information regarding inmate complaints and the prison population's commitment to the strike.

Between September 25 and 27, more than 100 alleged leaders of inmate groups were transferred to other corrections facilities. Soon thereafter, the prison administration learned that the remaining prisoners were

becoming more conciliatory, and that most would be willing to return to a regular work schedule. On October 5, small groups of inmates were allowed to resume their normal activities, and by October 14, the prison had returned to pre-strike status.

*The 1983 Report*

Pursuant to New York law, *see* N.Y.Correct.Law §§ 45(2), 45(3) (McKinney supp. 1983), the State Commission of Corrections sent observers to monitor conditions at the prison during the strike. It subsequently prepared a report setting forth its findings and recommendations, *see Attica 1983: A Report on the Inmate Strike and the Operations of the Attica Correctional Facility* (1983) [hereinafter cited as "1983 Report"]. Although the report commended the Department of Correctional Services and the prison administration for "bringing the strike to a close without a major incident," it intimated that many of the inmates' grievances were justified, and that serious problems existed in the prison. In conclusion, the report stated:

> Until a meaningful and substantive effort is undertaken to revamp the operation of the Attica facility and to address the problems cited in this report, the underlying tension and frustration that culminated in the strike will continue to pose a serious threat to the stability of the institution.

J.A. at viii.

Commissioner Coughlin immediately responded to the report, calling it "disturbing" and stating that it was "rife with unsubstantiated rumors, anonymous allegations, and unsupported allegations and conclusions." J.A. at 356. Coughlin blamed the disturbance solely on the prison's overcrowded conditions, which he claimed were the result of a federal court order requiring the institution to accept more inmates.[1] As he had one year earlier, the Commissioner published a lengthy reply to the report, in which he took issue with specific allegations and generally disputed the report's conclusions. Once again, inmates expressed interest in seeing copies of the critical document and, notwithstanding his belief that it contained numerous misstatements of fact, Coughlin allowed it to be delivered to members of the prison population.

*The Prisoners' Legal Services Report*

Prisoners' Legal Services of New York ("PLS") is a public interest law firm that represents inmates—including many incarcerated at Attica—in connection with a wide variety of legal actions. On November 22, 1983, the Buffalo Office of PLS published a report titled, *Attica: A Report on Conditions, 1983* ("PLS Report").[2]

The report's overall tone is explicitly supportive of prisoners' interests, and blatantly antagonistic to prison officials. In the introduction, PLS admits that among its purposes is "to focus public attention on the conditions at Attica Correctional Facility in order to prompt the Department of Correctional Services to remedy them as soon as possible." The introduction ends by "point[ing] out that this report merely sketches some of the most odious conditions at Attica."

The body of the document consists of a description of conditions allegedly prevailing at Attica. The prefatory section states: "[T]he most flagrant problems at Attica can be defined within two categories: the negative attitude exhibited by Attica officials toward the inmates in their charge, and the failure to provide adequate resources." *See* App. A at 1038. In a section titled "Racism," the report states:

1. In the aftermath of the 1971 riot, the population of the prison was administratively capped at 1700 inmates. During the summer of 1981, faced with a choice between opening 600 unused cells at the Rikers Island facility, and requiring DOCS to lift its cap at Attica, the federal district court chose the latter course. *See Benjamin v. Malcolm,* 528 F.Supp. 925, 926 (S.D.N.Y. 1981).

2. For the sake of absolute clarity, the entire text of the PLS Report is printed as Appendix A to this opinion, *see* infra page 1036. Salient portions are worthy of discussion in the text.

> Racism permeates the atmosphere at Attica.... [It] surfaces daily in racist acts against inmates.... Derisive racial remarks, threats on the lives of 'black niggers' and 'white nigger-lovers' and other forms of harassment by correction officers abound.

*Id.* at 1038–1039. The report goes on to relate that one Rastafarian inmate "informed [PLS]" that his dreadlocks had been cut off by a guard, who allegedly bragged that he was going to take them as a souvenir. Later in the same section, PLS writes that it "received reports" that officers roamed corridors in white sheets, and that inmates names had been handwritten by guards on photographs of lynched black men.

The next portion is devoted to a description of the "Special Housing Unit," more commonly known as solitary confinement. The authors write:

> Hardly a week passes that we do not receive letters about at least one inmate who was physically assaulted by correction officers either as he was escorted to the Special Housing Unit or, if he was already a box resident, on his way back from the exercise cell, visiting room or shower. These men are often handcuffed when the assaults occur.

*Id.* at 1041. The section ends by advocating the installation of videotape cameras in the halls and stairwells leading to the Special Housing Unit.

Next, the report examines the section of Attica known as "A Block," stating that it "is infamous for its explosive and dangerous living conditions." Later in that section, the report states:

> Inmates have written seeking help in situations such as the denial of medicine by correction officers, harassment on the way to disciplinary hearings and the refusal of officers to give them the cleaning materials for their cell. They have written of lights being cut off intentionally and of being fed improperly or sporadically. And they have written over and over again about brutality and blatant racism. In fact, though the truth of its reputation has never been investigated, A-Block is commonly known as "[Ku Klux] Klan Block."

*Id.* at 1043.

In concluding, the authors of the PLS Report appear to express their solidarity with (or at least sympathy for) those who took part in the sit-in strike, whom they characterize as "[d]esperate for change in their intolerable living conditions and frustrated by the failure of state and prison officials to remedy the most critical problems." *Id.* at 1048. In closing, the report calls on prison officials "to effectuate ... critically needed improvements." *Id.*

*Response to the PLS Report*

Studies of prison conditions generally, and particularly those prevailing at an institution as well-known as Attica, tend to make good copy for local news organizations. The PLS report was no exception. An enormous amount of statewide publicity was generated by the document's release in November 1983. State officials, including Commissioner Coughlin and Attica administrators, decried the document as irresponsible and woefully misleading. Although PLS was recognized as an advocacy group working on behalf of prisoners, the report sparked a storm of protest as the specter of Attica's deplorable conditions was once again raised in the public's consciousness.

PLS received requests from dozens of inmates, incarcerated at various prisons throughout the New York State system, for copies of the latest report. Uncertain of the response of prison officials, and fearing that inmates might be disciplined for possessing unauthorized copies, PLS wrote to Commissioner Coughlin on December 1, 1983, seeking permission to send copies into New York prisons. The December 1 letter requested that Commissioner Coughlin explain his reasons for censoring the report, if in fact he were to determine that it could not be delivered.

On January 18, 1984, the Commissioner responded that he would not allow delivery of the PLS Report to inmates in the New

York prison system. No reasons for his refusal were given at that time.

*The Proceedings Below*

On March 19, 1984, twenty-four inmates from correctional facilities throughout the State initiated this action in the district court for the Northern District of New York. Represented by PLS, they sought to enjoin Commissioner Coughlin and others from interfering with the delivery of copies of the report into New York prisons. The complaint, which alleged an ongoing violation of 42 U.S.C. § 1983 (1982), sought declaratory and injunctive relief, as well as attorneys' fees, as authorized by 42 U.S.C. § 1988 (1982). By notice filed March 27, the prisoners moved, pursuant to Fed.R. Civ.P. 65(a), for the preliminary injunction that is the subject of this appeal. The motion was made returnable before Magistrate Ralph W. Smith, Jr., on April 19, 1984. By amended notice of motion dated April 9, 1984, the state officials opposed the prisoners' motion, and cross-moved for an order disqualifying PLS from representing the plaintiffs. The prisoners responded by motion on April 12, opposing the state's attempt to disqualify their counsel, and cross-moving for an order striking allegations to the effect that PLS had been involved in organizing the September 1983 strike.

On April 19, 1984, Magistrate Smith heard oral argument in connection with the motions, and on April 27, he issued his order and report-recommendation. Finding that the state had "presented a pretext for a claim of a clear and present danger to prison discipline and security," J.A. at 42, he recommended that the preliminary injunction be denied. He found that residual tension existed at Attica in the aftermath of the September 1983 strike, and that introduction of the report into the prison presented a clear security risk. He quoted language from the Commissioner's affidavit, stating that allegations in the document were "couched in irresponsible and inflammatory language" and "calculated to inflame an already difficult situation." J.A. at 42. He further ordered that the state's motion to disqualify PLS as counsel for the prisoners be denied "without prejudice to renewal," and also denied the prisoners' motion to strike those portions of the State's affidavits that related to the alleged involvement of PLS in the September 1983 strike.

Two months later, Judge Foley issued a memorandum-decision and order, in which he challenged the Magistrate's recommendations. Addressing the prisoners' cross-motion to strike testimony regarding PLS's role in the strike, Judge Foley wrote that "such allegations are not germane or relevant to the First Amendment issues raised by the complaint," J.A. at 32, and ordered them struck. The ruling of the Magistrate denying the motion to disqualify PLS "without prejudice" was modified to deny it without qualification and with prejudice. Finally, the judge concluded that the prisoners' motion for a preliminary injunction should not be resolved on the basis of affidavits presenting disputed issues of fact, *see Forts v. Ward,* 566 F.2d 849, 851–52 (2d Cir.1977), and ordered it recommitted to the Magistrate for an expedited evidentiary hearing.

Testimony was given before Magistrate Smith on August 14 and 15, 1984. After answering questions regarding his background and experience in prison administration, Commissioner Coughlin recounted his reasons for denying delivery of the PLS report into state prison facilities:

> I had seen a copy of the report when it was published in November of 1983, and I felt, felt very strongly that the report presented a clear and present danger to the institution. It was full, as far as I was concerned of inflammatory remarks, unsupported statements, allegations that were presented as facts without any attempt to balance or to indicate that the statements that they made in the report were not facts, but were allegations.
>
> I felt that to introduce this report into the prison system, specifically and especially Attica at that point in time, November 1983 was not the right thing to do.

The prison, even though it was back to full operation, was still extremely tense.

J.A. at 107–08. The Commissioner went on to enumerate the statements he believed were couched as facts in the report, and to challenge them individually. For example, he described the procedure whereby entering prisoners are shaved and given haircuts, photographed, and then allowed to let their hair grow back to whatever length they choose. In his view, the report's description of a Rastafarian inmate having his hair cut against his will was nothing more than a recapitulation of normal intake procedures. Similarly, he denied that the incident involving inmates' names being written by guards on photographs of lynched black men ever could have occurred, because the nicknames used were not known to corrections officers. He repeatedly objected to the misleading presentation of allegations as matters of fact.

Over a strenuous objection by counsel for the prisoners, Commissioner Coughlin then began to describe the second ground for his decision to ban the report from prison facilities. He testified that he had received "information ... that the Prisoners' Legal Services was involved in the organization of the [September 1983] strike." J.A. at 108–09. Although Magistrate Smith "agree[d] with [the state]" that such evidence should be admitted, he felt "bound by the determination of Judge Foley's [June 20] order", J.A. 113, and sustained the objection ending this particular line of testimony.

On cross-examination, counsel for the prisoners directed Coughlin's attention to the precise language of various statements he had objected to as erroneously couched as fact. In many instances, the Commissioner was forced to admit that there were, in fact, phrases such as "one inmate informed us ...," "frequently, we hear about ...," "we received reports ...,"—phrases indicating that the conditions alleged in the report were just that—allegations. Moreover, at one point the Commissioner admitted that even if he had been satisfied that every allegation in the Report had been true, it would not have altered his decision to prevent the document from being delivered to inmates. Conditions at state maximum security institutions, and particularly at Attica, were simply too "tense" to allow introduction of what he deemed an inciteful report.

Yet, Commissioner Coughlin testified that other reports, news articles and court decisions critical of prison conditions had been received by inmates at various institutions without any adverse effect on security in those prisons. The 1983 Report, which he had earlier characterized as unprofessional, unfair and nonobjective was allowed in. The 1982 Report, which he criticized as "misleading and irresponsible," was available to interested inmates. Even copies of a newspaper called *Revolutionary Worker* were delivered to prisoners, notwithstanding the following militant language: "Far from the futile hopeless act of despair, the riot at Attica was and is a real call to those who would rise against the oppressors." J.A. at 232–33. Finally, Coughlin admitted that newspaper stories containing detailed descriptions of the PLS Report were allowed to be delivered to inmates at Attica and other state prisons.

When asked whether there existed any demonstrable connection between the introduction of such "inflammatory" materials and incidents of unrest inside any maximum security prison, the Commissioner admitted that no hard evidence of a causal connection existed. Nevertheless, he restated his belief that such material had the potential for inciting insurrection within an institution. The fact that there was no evidence tracing a particular violent episode to the introduction of a given news article or report, he believed, was simply the result of the inexactitute of penological sciences.

Why then, Coughlin was asked, should the PLS Report be kept out, when equally "inaccurate" and "incendiary" material had not been restricted? In part, he responded, the PLS Report was different because PLS had gained the respect of so many prisoners. He believed inmates could recognize

the political rhetoric of the *Revolutionary Worker* for what it was. A study bearing the imprimatur of so trusted an organization, on the other hand, was liable to be taken much more seriously, and thus was considerably more threatening to prison security.

Finally, the role of the censorship guidelines contained in DOCS Directive No. 4572 (March 2, 1979) ("Directive 4572")[3] was explored at some length. That directive, titled *"Guidelines and Procedures Governing the Receipt and Review of Literature and Related Materials for Inmates,"* had been issued in early 1971, and updated from time to time thereafter. It set forth specific standards by which material sent to inmates was to be reviewed and, if need be, censored. Moreover, it contained procedures to be followed in the event a given publication was deemed to be subject to prior restraint. Specifically, the guidelines direct that each institution is to establish a "media review committee," which is to have ultimate authority in deciding what materials may be denied to inmates. Maximum time periods within which the committee must meet, procedures for advising inmates of the adverse decisions and appellate rules are all provided for in Directive 4572.

At the evidentiary hearing on August 15, Commissioner Coughlin testified that he had not applied the standards set out in Directive 4572. Instead, his decision was reached by reference to his personal and professional judgment concerning the inherent danger in allowing the PLS Report to be read by prisoners.

After hearing the Commissioner's testimony, Magistrate Smith filed a second report-recommendation on September 7, 1984. He found that Coughlin had not applied Directive 4572 and, moreover, that the PLS Report did not violate the guidelines set forth in it. The Magistrate also found that the Commissioner's reaction to the PLS report was "not unlike" his reaction to earlier reports that were allowed into New York State prisons, and that those other reports had been received by inmates without demonstrable adverse effect on security interests. Deeming the prisoners to have shown irreparable injury, and believing that they had sustained their burden of demonstrating a likelihood of success on

3. The guidelines contained in Directive 4572 are divided into three sections: policy, standards and procedure. In setting forth departmental policy, the directive states:

> It is Departmental policy to allow access by inmates to literature and related materials for either program or private individual use. Accordingly, inmates shall be allowed to subscribe to or receive from authorized correspondents a wide range of books, magazines, and newspapers. The reading of worthwhile materials is to be encouraged. The understanding of the content of a wide range of subject matter may contribute to the development of a more knowledgeable and responsible human being with increased capacity to understand and adjust to society.

Directive 4572 goes on to set forth specific standards against which literature is to be evaluated. Four of these deserve reprinting here:

> 3. The publication should not incite violence based on race, religion, creed or nationality.
>
> * * * * * *
>
> 5. Any publication which advocates and presents a clear and immediate risk of lawlessness, violence, anarchy or rebellion against governmental authority is unacceptable.
>
> * * * * * *
>
> 6. The publication should not incite disobedience towards law enforcement officers or prison personnel.
>
> * * * * * *
>
> 9. Any publication which presents a clear and immediate risk to the safety of any person or a clear and immediate risk to the order of the correctional facility is unacceptable.

Finally, the guidelines specify procedures for "evaluation and decisionmaking regarding literature for inmates." First, each institution is directed to establish a "media review committee," consisting of representatives from various program services within the facility as well as members of the security staff. When it is determined that literature addressed to an inmate should be reviewed, the committee is to meet and discuss the material within three weeks from the date of its receipt. Inmates are to be notified that a review is taking place, and are allowed to submit written statements explaining their desire for the literature. If the committee determines that the literature is unacceptable, its reasons are to be communicated to the inmate in writing. Finally, if the inmate wishes, he may appeal the decision of the committee to a central review committee, which in turn must meet to make a determination within three weeks.

the merits, Magistrate Smith recommended that the preliminary injunction be granted.

By order dated November 8, 1984, Judge Foley adopted the recommendation, and enjoined Commissioner Coughlin from "refusing to allow plaintiffs, and other inmates of New York Correctional Facilities, from receiving [sic] upon request to the Prisoners' Legal Services of New York copies of 'Attica: A Report on Conditions, 1983.'" 596 F.Supp. 1064 at 1068. Judge Foley agreed to stay the injunction for ten days, during which time the state moved before this Court for a stay pending appeal. A panel of this Court granted the stay on November 27, 1984, and expedited the instant appeal.

## II. DISCUSSION

### A. *Standards for Injunctive Relief*

It is well settled in this Circuit that a party seeking injunctive relief must establish that the injunction is necessary to prevent irreparable harm and that he is likely to prevail on the merits of the underlying controversy. In the alternative, he may demonstrate irreparable injury and the presence of sufficiently serious questions going to the merits as to make them a fair ground for litigation, together with a balance of hardships tipping decidedly toward the movant. *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, 1099 (2d Cir.1984); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 54 (2d Cir.1979); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*). A movant seeking to avail himself of the first alternative need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt. *See Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953); 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2948 at 452 (1973).

Normally, the purpose of a preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits. *See Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976); *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1360 (2d Cir.1976). Occasionally, however, the grant of injunctive relief will change the positions of the parties as it existed prior to the grant. Such is the case in the dispute before us today. If the injunction against Commissioner Coughlin is upheld, he will be required to allow delivery of the PLS Report into New York's prisons, and the controversy will have been settled with some finality.

Where such is the case, an injunction is often deemed mandatory, rather than prohibitory, and a greater showing is required of the moving party. *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2d Cir.1977). In these circumstances, we have held that an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested," *Flintkote Co. v. Blumenthal*, 469 F.Supp. 115, 125–26 (N.D.N.Y.), *aff'd*, 596 F.2d 51 (2d Cir.1979), or where "extreme or very serious damage will result" from a denial of preliminary relief, *Clune v. Publishers' Ass'n*, 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd*, 314 F.2d 343 (2d Cir.1963). In sum, we have shown "greater reluctance to issue a mandatory injunction than a prohibitory injunction." *Hurley v. Toia*, 432 F.Supp. 1170, 1175 (S.D.N.Y.), *aff'd mem.*, 573 F.2d 1291 (2d Cir.1977).

The distinction between mandatory and prohibitory injunctions, however, cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset. As suggested by the terminology used to describe them, these equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or refrain from performing. In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly,

an order to perform in a particular manner may be tantamount to a proscription against performing in any other.

In deciding the instant dispute, we are convinced that there indeed exists a principled manner in which to describe the relief sought. Despite the fact that the *status quo* would be altered by the grant of injunctive relief against Commissioner Coughlin, the gravamen of the prisoners' claim is that he interfered with the delivery of a document addressed to them by a third party, and the relief sought is an injunction ordering him to cease his interference. Our discussion of the prisoners' complaint would be very different indeed if we read it to require Coughlin to provide them with copies of the report. Because we do not construe the requested relief in this manner, we are persuaded that the injunction sought is more prohibitory than mandatory in nature.

Nevertheless, realizing that an affirmance of Judge Foley's order will grant the prisoners substantially all the relief they ultimately seek, we believe that a more stringent standard than that required for a grant of a garden variety negative injunction should be applied. *See Clune v. Publishers' Ass'n, supra,* 214 F.Supp. at 531. Accordingly, we hold that the prisoners must show a substantial likelihood of success on the merits, *i.e.,* that their cause is considerably more likely to succeed than fail (together, of course, with the requisite irreparable injury). By employing such a standard, we may content ourselves in the knowledge that injunctive relief will not be precipitously granted in cases where the grant may serve to provide all the relief that is sought on the merits.[4]

B. *Irreparable Injury*

Having determined the proper standard against which to measure the facts of this dispute, we turn first to examine whether the prisoners have met their burden of showing that they will be irreparably harmed if the preliminary relief sought is not forthcoming. In deciding a similar case, Judge Weinfeld wrote: "To deprive one of his constitutional rights ... to read what he will and when he will, is in this Court's view irreparable and immediate injury." *Fortune Society v. McGinnis,* 319 F.Supp. 901, 903 (S.D.N.Y.1970). Precious first amendment liberties would be rendered all but meaningless if those rights could be restricted even for short periods of time. *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

In deciding that cases such as *Elrod* control in the context of censorship of information sent to prisoners, we are mindful of the fact that corrections officials may require a certain time interval within which to review incoming documents. In the words of a recent Supreme Court decision, they "must be permitted to act before the time when they can compile a dossier on the eve of a riot." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541–42, 53 L.Ed.2d 629 (1977) (footnote omitted). We do not suggest that a momentary restraint will suffice to constitute the irreparable injury required for the grant of equitable relief.[5] Rather, we express our be-

4. On review by the Court of Appeals, of course, the interregnum between deciding whether there has been a showing of a likelihood of success on the merits and the actual determination of the merits is no longer than the time necessary to turn a page. Accordingly, the textual discussion is intended to provide guidance to district courts in addressing claims for injunctive relief *ab initio.*

5. The guidelines contained in DOCS Directive 4572, *see supra* note 3 and accompanying text, provide that material will be reviewed by the media committee within three weeks of its receipt, and that an unfavorable determination will be communicated in writing to the inmate immediately. Within one week thereafter, the inmate may appeal to the central committee, which must act on the appeal within an additional three weeks. We believe the time periods set forth in DOCS 4572 are reasonable to provide corrections officials with the time necessary to make determinations of unsuitability or danger, and, accordingly state our opinion that nondelivery during the specified periods will

lief that a categorical refusal to permit delivery of a given document (particularly where, as here, that refusal continued over a period of some months) is sufficient to make such a showing. Accordingly, we turn to examine the ultimate question on appeal—whether Commissioner Coughlin's decision to deny delivery of the PLS Report to Abdul Wali and the other named plaintiffs worked a deprivation of the rights guaranteed them under the first amendment.

C. *Standing Concerns*

Before we consider whether the prisoners' constitutional "rights" have been violated, it is important to define with some precision what "rights" (and whose) are implicated in this dispute. As always, our starting point is the language of the first amendment: "Congress shall pass no law ... abridging freedom of speech, or of the press." U.S. Const. amend. I. A reading of these venerable words suggests that they are prohibitory in nature and that the government is forbidden to interfere with the natural flow of information. *See Hynes v. Mayor & Council of Borough of Oradell,* 425 U.S. 610, 621 n. 5, 96 S.Ct. 1755, 1761 n. 5, 48 L.Ed.2d 243 (1976); *see also* L. Tribe, *American Constitutional Law* § 12–19 at 674–75 (1979) (elucidating, but not adopting, this position).

With this view in mind, it is logical that PLS, as the author of the censored report, would have standing to challenge Commissioner Coughlin's decision. *See, e.g., Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972); *Fortune Society v. McGinnis,* 319 F.Supp. 901 (S.D. N.Y.1970). For, most observers would intuitively agree that it is PLS's "freedom of speech"—its attempt to communicate—that allegedly is being "abridged." Yet, upon closer examination, this seemingly obvious conclusion proves not to be inevitable. It might plausibly be argued that PLS has not been governmentally deprived (in sum or in part) of its right to "speak." PLS, through its report, has spoken to the thousands of individuals who have read the document, or been made aware of its contents through the press; it has communicated to all those who could be reached through normal channels of communication without government assistance. An advocate of this position would point to the fact that the state has simply failed to take an affirmative step to deliver the communication to some few of its intended receivers. And remembering that such affirmative steps are not explicitly mandated by the language of the first amendment, it would appear that no violation had occurred.

Of course, such a construction drains that most profound of guarantees of its spirit. For in many situations, a distinction between affirmative and passive modes of interference would effectively eviscerate the freedoms that we as a society have come to cherish. During the past two centuries, the federal and state governments have become involved in virtually all aspects of our collective lives. In our society, the once bright line between the public and private spheres has increasingly become blurred. If the right to speak is to retain its historical vitality, government must not unduly interfere with a willing party's liberty to listen. *See* Baker, *Commercial Speech: A Problem in the Theory of Freedom,* 62 Iowa L.Rev. 1, 8 (1976). Were we not to deem certain acts of governmental nonfeasance violative of the first amendment, citizens would retain their right to "speak," but could not be certain their words would be heard by their intended audience.

Accordingly, the words of the first amendment have long been read to mean that, where the government stands as an inexorable link in a communicative chain, it has the duty—whether by affirmative action or passivity—to see to it that the communication is not stifled. If, whether by its action or inaction, the communication is

not suffice to constitute irreparable injury of the type that must be shown for a grant of injunctive relief.

interrupted, both the speaker and attempted receiver have standing to challenge the act of interference on the part of the state.

The views expressed regarding standing to challenge alleged first amendment violations comport with those of other courts faced with similar controversies. In the oft-repeated aphorism of Justice Holmes: "The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues...." *Milwaukee Social Democratic Pub. Co. v. Burleson,* 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J., dissenting). This venerable language reflects an understanding of the fact that, where the government controls the means of delivering communication, it has an affirmative duty to do so, absent some special circumstances.

In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court examined a challenge by prison inmates against mail censorship regulations promulgated by the California Department of Corrections. In analyzing the proper standard of review for such a constitutional challenge, the Court chose to deal not simply with the rights of the prisoners, but also with the liberty interests of the unincarcerated senders of the censored letters. In choosing this approach, Justice Powell wrote:

> Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each.... [T]he addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication. *Lamont v. Postmaster General,* 381 U.S. 301 [85 S.Ct. 1493, 14 L.Ed.2d 398] (1965); *accord, Kleindienst v. Mandel,* 408 U.S. 753, 762–65 [92 S.Ct. 2576, 2581–83, 33 L.Ed.2d 683] (1972); *Martin v. City of Struthers,* 319 U.S. 141, 143 [63 S.Ct. 862, 863, 87 L.Ed. 1313] (1943).

*Id.* at 408–09,[6] 94 S.Ct. at 1808–09.

For our purposes, it is enough to recount the following facts: Abdul Wali and other inmates expressed interest in receiving copies of the PLS Report from the organization responsible for its promulgation. PLS in turn requested permission of Commissioner Coughlin to send copies of the document to residents of various state prison facilities at no cost to DOCS. The Commissioner refused to deliver them to members of the prisons' population. We deem such a decision by a state official (whether cast as one to act or to refrain from acting) to constitute interference with attempted communication of the type falling squarely within the ambit of the first and fourteenth amendments. Accordingly, we turn to examine whether such interference was permissible under the applicable precedents.

## D. *Standards for Reviewing Claimed Violations of Prisoners' Rights*

Our discussion starts with a simple proposition stated by the Supreme Court more than a decade ago, and reiterated frequently in the intervening years: "A prisoner does not shed ... basic First Amendment rights at the prison gate. Rather, he 'retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law.'" *Procunier v. Martinez,* 416 U.S. 396, 422–23, 94 S.Ct. 1800, 1815–16, 40 L.Ed.2d 224

6. In a footnote to the opinion, Justice Powell wrote that "[d]ifferent considerations may come into play in case of mass mailings," *Procunier v. Martinez, supra,* 416 U.S. at 408 n. 11, 94 S.Ct. at 1809 n. 11. We need not decide at this juncture whether the copies of the report requested by and denied to Abdul Wali and his fellow prisoners constitute a "mass mailing," for the import of the footnoted language lies in the "particularized interest" of the senders, rather than any right of the prisoners.

(1974) (Marshall, J., concurring) (*quoting Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir.1944)).

Reading these words today, we are struck by the seeming inevitability of this tenet. Yet, it bears remembering that such was not always the case. In the not too distant past, a prison inmate was considered a "slave of the state," having "not only forfeited his liberty, but all his personal rights...." *Ruffin v. Commonwealth,* 62 Va. (21 Gratt.) 790, 796 (1871), *quoted in Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 139, 97 S.Ct. 2532, 2545, 53 L.Ed.2d 629 (1977) (Marshall, J., *dissenting*). The idea that citizens were deprived of all constitutionally guaranteed rights by virtue of their incarceration led to, or at least allowed for, the assumption of a "hands off" posture by the courts. *See generally* Note, *Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts,* 72 Yale L.J. 506 (1963) (thorough analysis of the "hands off" doctrine). In this "hands-off" stance, courts paid absolute deference to the decisions of prison administrators.

The temptation to take refuge in the "hands off" policy of the past is, at times, great indeed. We are ever cognizant of our shortcomings in this sphere, and often fearful lest we intrude unnecessarily into the realm properly reserved to those with "hands-on" experience in the penological sciences. Yet intrude we must, if we are to uphold our oaths. To do otherwise "would be to turn our backs on what our learning, our consideration, and our deepest convictions persuade us is a right under the law and the Constitution. In a real sense, we do what we must." Kaufman, *Chilling Judicial Independence,* 88 Yale L.J. 681, 689 (1979) (adaptation of the 34th Annual Benjamin N. Cardozo Lecture).

E. *The Controlling Precedents*

During its 1973 Term, the Supreme Court sought to establish a framework within which to analyze prisoners' claims of first amendment violations. In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Court held that an inmate's personal correspondence could not be censored "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." *Id.* at 413, 94 S.Ct. at 1811. Rather, it was incumbent on corrections officials to show that the act of censorship furthers an important governmental interest (such as rehabilitation or prison security), and that the limitation on first amendment freedoms is no greater than necessary under the circumstances. *Id.*

Applying that standard to the facts of *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court found that the state had made its requisite showing. In *Pell,* inmates and journalists challenged the constitutionality of a regulation prohibiting reporters from conducting interviews with convicts. In upholding the limitation on inmates' unfettered rights to communication, the Court stressed that other avenues of communication (e.g., correspondence by mail, sending messages with personal visitors) remained open to the prisoners. *Id.* at 824–25, 94 S.Ct. at 2805. Accordingly, the regulation was characterized as a reasonable "time, place, or manner" restriction, *id.* at 826, 94 S.Ct. at 2806; *see Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *Cox v. New Hampshire,* 312 U.S. 569, 575–76, 61 S.Ct. 762, 765–66, 85 L.Ed. 1049 (1941).

Writing for a majority of the Court, Justice Stewart deemed the policy "reasonable" on the basis of the officials' judgment that it would serve to limit visitation to a manageable level, while at the same time allowing contacts between prisoners and "those persons who will aid in their rehabilitation," *Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. at 2806. In discussing the permissible scope of limitations on one of alternative channels of communication, he wrote:

> [C]onsiderations [regarding penological interests] are peculiarly within the province and professional expertise of correc-

tions officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. Courts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties. But *when the issue involves a regulation limiting one of several means of communication by an inmate,* the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation.

*Id.* (emphasis supplied).

Although the standards announced in *Martinez* and applied in *Pell* were derived by reference to inmates' personal communications, they have since been followed by courts in this Circuit[7] to resolve cases involving an inmate's right to receive publications. *See e.g., Morgan v. LaVallee,* 526 F.2d 221 (2d Cir.1975); *Jackson v. Ward,* 458 F.Supp. 546 (W.D.N.Y.1978).

In *Morgan v. LaVallee,* 526 F.2d 221 (2d Cir.1975), we reviewed the dismissal of a prisoner's complaint alleging that corrections officials had impermissibly refused to allow delivery of a specific publication. We there expressed our views that "First Amendment rights to hold and express beliefs and receive information are entitled to 'special solicitude.'" *Id.* at 224 (*citing Newkirk v. Butler,* 364 F.Supp. 497, 501 (S.D.N.Y.1973), *aff'd,* 499 F.2d 1214 (2d Cir. 1974), *vacated as moot and dismissed sub nom., Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)); *see Sostre v. McGinnis,* 442 F.2d 178, 189 (2d Cir.1971) (en banc), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). Any abridgement of these rights, we held, would be permitted only where "receipt of [a] publication would constitute a threat to prison security or order or the inmate's own rehabilitation." *Morgan v. LaVallee,* 526 F.2d at 224. Finally, we held that the standard announced in *Martinez* must be met if the decision to bar a particular publication is to be approved. *Id.* at 224–25.[8]

Commissioner Coughlin argues that the two-prong standard announced in *Martinez,* and the cases decided by reference to that standard, are no longer controlling in light of more recent Supreme Court precedent. *See Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Block v. Rutherford,* — U.S. —, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Instead, Coughlin urges that the only relevant inquiry is whether his decision to ban the PLS Report was a reasonable exercise of his discretion. Unless conclusively shown to be unreasonable, he argues, his judgment must control.

A careful reading of the cases cited by the Commissioner, however, reveals that the "reasonableness" standard was propounded and applied in situations very different from the case before us. In

7. *Martinez* has been applied to this context in other circuits as well. *See, e.g., Pepperling v. Crist,* 678 F.2d 787, 790 (9th Cir.1982); *Vodicka v. Phelps,* 624 F.2d 569, 571 (5th Cir.1980); *Blue v. Hogan,* 553 F.2d 960, 962 (5th Cir.1977) (*per curiam*); *Hopkins v. Collins,* 548 F.2d 503, 504 (4th Cir.1977); *Aikens v. Jenkins,* 534 F.2d 751, 755 (7th Cir.1976).

8. More recently, the district court for the Western District of New York applied the *Martinez* test to guidelines governing the censorship of publications sent to prisoners. *See Jackson v. Ward,* 458 F.Supp. 546 (W.D.N.Y.1978). In an exhaustive opinion, Judge Curtin construed *Martinez* to require a "substantial factual showing by corrections officials that a publication poses a tangible threat to the order, security, or rehabilitative programs of the prison before they may bar the publication from the facility." *Id.* at 559. We agree that such a requirement is necessary to ensure compliance with the Supreme Court's mandate that censorship be permitted only to the extent necessary to protect penological interests. *Id.; see Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811.

*Jones v. North Carolina Prisoners Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977),—the principal case relied on by the state—the Court explicitly stated that "First Amendment speech rights are barely implicated." *Id.* at 130, 97 S.Ct. at 2540 (footnote omitted). Although that statement alone suffices to distinguish *Jones* from this case, numerous other grounds exist. In deciding *Jones,* where prisoners' associational rights were balanced against the potential security threat posed by group meetings, the Court indeed adopted a "reasonableness" standard against which corrections officials' conduct was to be measured. In holding that the officials need not "show affirmatively that [a proposed prisoners union] would be 'detrimental to proper penological objectives,'" or would constitute a "present danger to security and order," *id.* at 128, 97 S.Ct. at 2539 (*citing Pell v. Procunier, supra,* 417 U.S. at 827, 94 S.Ct. at 2806), the Court merely evinced its belief that such a present danger could be presumed. "[A] prisoners' union," wrote Justice Rehnquist, "would rank high on anyone's list of potential trouble spots." *Id.* at 133, 97 S.Ct. at 2541. We agree, and thus read the Court's result to reflect the view that, because union organizing activities are presumptively dangerous, the burden falls on the prisoners who wish to engage in that activity to show that official resistance was unreasonable. But we do not believe that the receipt by prisoners of incoming publications is presumptively dangerous. Accordingly, the reasoning of *Jones* is of limited usefulness in the case at hand.

Neither do we find *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), particularly helpful to the Commissioner's position. There, the Court determined, *inter alia,* that a limited restriction on receipt by pre-trial detainees of hardbound books did not infringe the inmates' first amendment rights. *Id.* at 551, 99 S.Ct. at 1880. Again, the burden of showing that the limitation was unreasonable was placed on the prisoners. But a host of considerations present in that case narrows its application to the one before us today. First, and perhaps most important, the Supreme Court stressed that the challenged regulation was content neutral. *Id.* By contrast, Commissioner Coughlin's decision to ban the PLS Report was based solely on his distaste for its message. Moreover, the restriction in *Wolfish* limited only one of a number of alternative means of communication—prisoners were allowed to receive softcover books and magazines, or to use the facility's "relatively large" library. *Id.* at 552, 99 S.Ct. at 1881. Finally, because the claimants were pre-trial detainees, most of whom were released in less than sixty days, the restriction worked only a limited deprivation. In sum, because the challenged regulation was characterized merely as a "time, place, or manner restriction," *id.; see Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972), and was not deemed unduly burdensome of the rights of prisoners, the Court concluded that a *Martinez*-type showing by the prison officials was not required.

Finally, the Commissioner's attempted reliance on two cases decided last term, *see Block v. Rutherford,* — U.S. —, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), is unpersuasive. First, neither case implicated first amendment rights. *Hudson v. Palmer,* which held that the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of [a] prison cell," — U.S. at —, 104 S.Ct. at 3200, rested on the presumption that "privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Id.* *A fortiori,* such a conclusion dictates virtually unbounded deference to a corrections official's discretion, for there is no prisoner interest against which to balance it. Unless we are prepared to say that a right to receive information is inherently inconsistent with the proper "needs and objectives" of penal institutions, such unexamined def-

erence would be misplaced. *Block v. Rutherford*, — U.S. —, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), the other recent precedent pointed to by the Commissioner, upheld a blanket prohibition on contact visits in a prison. The Court found that the categorical ban in that case was justified by the many problems inherent in making case-by-case determinations of which visits to allow. Prison officials stressed the enormous security risk flowing from the introduction of contraband into the prison population, and demonstrated the difficulty in identifying particularized risks. Moreover, the Court was convinced by the state's argument that allowing some visits, while at the same time disallowing others, would breed tension and resentment—incendiary elements in any maximum security facility. As was true in *Jones,* the Court appeared to believe that contact visits are presumptively dangerous. Accordingly, it properly cast upon the complaining inmates a burden to show that the means used to restrict the activity were unreasonable. We do not believe that reading a broad range of incoming mail, magazines, books and other publications may be said to pose a presumptive threat to prison order or security. And absent that presumed danger, the burden remains on prison officials to establish that a given publication poses a threat to penological interests.

Commissioner Coughlin cites the cases described above not merely for their individual holdings or reasoning, but in an attempt to glean a "trend" from recent Supreme Court jurisprudence in the area of prisoners' rights.[9] "In its recent decisions," he states, "the Supreme Court has increasingly emphasized wide-ranging deference to the judgments of prison officials that considerations of security require the denial of rights asserted by prisoners." Brief for Appellants at 21. We decline to engage in the type of jurisprudential clairvoyance urged upon us by the Commissioner. "Trends" are developed one decision at a time, and judicial pronouncements derive their meaning solely by reference to the facts of individual cases. Whether or not courts have become more solicitous of prison officials is simply not the issue before us. Our task is far more discrete; we need only determine whether, balancing penological interests against the retained rights of prison inmates, Commissioner Coughlin's decision to keep copies of the PLS Report out of the institutions under his control was a permissible exercise of his discretion.

We are mindful that security in our prisons has traditionally been held to be central to all other correctional goals. *See Jones v. North Carolina Prisoners' Labor Union Inc., supra,* 433 U.S. at 129, 97 S.Ct. at 2539; *Bell v. Wolfish, supra,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78; *Pell v. Procunier, supra,* 417 U.S. at 823, 94 S.Ct. at 2804; *Procunier v. Martinez, supra,* 416 U.S. at 412–13, 94 S.Ct. at 1810–11. Accordingly, where an institutional restriction infringes a constitutional guarantee, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish, supra,* 441 U.S. at 547, 99 S.Ct. at 1878; *see Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. at 129, 97 S.Ct. at 2539. In evaluating a given restriction, courts have wisely

9. Similarly, the Commissioner argues that other circuits have restricted the scope of their review of corrections officials' discretion in the years since *Martinez* was decided. We disagree, deeming his reliance on two recent decisions to be misplaced.

In *Vodicka v. Phelps,* 624 F.2d 569 (5th Cir. 1980), where the court found that a prison's restriction on reading materials was not improper, the standard applied was the strict *Martinez* test, rather than the more deferential approach of *Jones. Vodicka, supra,* 624 F.2d at 571. *Pittman v. Hutto,* 594 F.2d 407 (4th Cir. 1979), addressed a challenge to state censorship of a prisoners' magazine, as well as the prepublication review guidelines that had been formulated through the joint efforts of prison officials and inmate editors. The court's holding—that the prisoners' first amendment rights had not been violated, and that the prepublication system was reasonable—was based partly on the failure of the prisoners to comply with the review process. By contrast, Wali and his fellow inmates do not challenge the validity of Directive 4572, *see supra* note 3. In this case, it was Commissioner Coughlin, and not the inmates, who failed to follow the guidelines.

sought the guidance and expertise of prison officials in assessing the likelihood of danger flowing from the restricted activities. The difficult task lies in determining the degree of deference to be accorded in a given setting.

Our reading of the cases suggests a tripartite standard, drawn by reference to the nature of the right being asserted by prisoners, the type of activity in which they seek to engage, and whether the challenged restriction works a total deprivation (as opposed to a mere limitation) on the exercise of that right. Where the right asserted is found not to exist within the prison context, i.e., where it is held to be inherently inconsistent with established penological objectives, *see, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629, then *a fortiori* there can be no invasion of the purported right, and judicial deference should be nearly absolute. In these situations, the proper role of the court ends with the determination that the asserted right does not inhere within the prison's walls. Having decided that the scales are not in motion, there is no further need for jurisprudential balancing.

Where the activity sought to be engaged in by prisoners is presumptively dangerous, deference to the judgment of corrections officials should be extremely broad, though not categorical. *See, e.g., Block v. Rutherford,* —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). This, notwithstanding the fact that the restriction being examined does indeed abridge a recognized constitutional right. In such cases, our intuition and common sense would support the imposition of a burden upon prisoners to demonstrate that the restriction is not supported by a reasonable justification.

Similarly, prison officials must be afforded wideranging deference in promulgating and implementing restrictions that proscribe only one of numerous available means of enjoying protected liberties. Because such restrictions work only limited privations, courts should yield to official determinations regarding their necessity and propriety. *See, e.g., Bell v. Wolfish, supra,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *Pell v. Procunier, supra,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495. It would be too easy for us to substitute our judgments for those of trained professionals with years of firsthand experience. But where a regulation or practice does no more than define the "time, place or manner" in which prisoners may enjoy a protected right, we must avoid the temptation to do so.

Where, however, the activity in which prisoners seek to engage is not presumptively dangerous, and where official action (or inaction) works to deprive rather than merely limit the means of exercising a protected right, professional judgment must occasionally yield to constitutional mandate. In these limited circumstances, it is incumbent upon prison officials to show that a particular restriction is necessary to further an important governmental interest, and that the limitations on freedoms occasioned by the restriction are no greater than necessary to effectuate the governmental objective involved. *See Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811.

We turn, then, to examine the restriction imposed by Commissioner Coughlin's refusal to permit delivery of the PLS Report. We stress that the right allegedly infringed is the right to receive and read publications generally, rather than the PLS Report in particular. It cannot be said that this first amendment right asserted by Abdul Wali and his fellow inmates is inherently inconsistent with proper penological objectives.[10] In fact, it may well serve to

**10.** The jurisprudence of first amendment interpretation has been premised on the value of expressional liberties. In *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), Justice Brandeis noted the inexorable link existing between the first amendment and our nation's abiding concern for intellectual liberty.

> Those who won our independence believed that the final end of the State was to make men free to develop their faculties; ... They

further an important basic purpose of incarceration. The total isolation of prisoners from society that marked our penal system for so many years was among its most destructive aspects. The rehabilitative goals for which we strive are furthered by efforts to inform and educate inmates, and foster their involvement in the world outside the prison gates. Although committing an illegal act may require the physical segregation of an individual from the society at large, it does not dictate that the prisoner's mind be similarly locked away to atrophy during the period of his incarceration.[11]

Indeed, it has never been suggested that prisoners lose the broad sweep of first amendment rights by virtue of their confinement, though their liberties may, of course, be restricted where necessary. *See Jones v. North Carolina Prisoners' Labor Union, Inc., supra,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629; *Pell v. Procunier, supra,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495; *Procunier v. Martinez, supra,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *Morgan v. LaVallee, supra,* 526 F.2d 221. Moreover, we have recognized that prisoners' rights to speak and to receive information are deserving of "special solicitude." *See Morgan v. LaVallee, supra,* 526 F.2d at 224. Continuing to adhere to that view, we turn next to examine the particular activity sought to be engaged in, and the nature of the restriction on that activity.

Often, a determination of the presumptive dangerousness of the activity sought to be engaged in will overlap with an evaluation of the asserted right's viability in a prison context. In *Jones,* however, a right of association was found to survive incarceration, but the union organizing activity was deemed an inherent security risk. We mention this dichotomy merely to point out that the second inquiry is not in all cases merely replicative of the first. In this case, it is sufficient to repeat that reading publications is generally beneficial, and poses no presumptive threat to prison security and order.

Finally, we find that Commissioner Coughlin's refusal to allow delivery of the PLS Report was an absolute bar to the receipt of the material contained in it, and thus worked an absolute deprivation of the prisoners's rights under the first amendment. It is simply impossible to characterize his action as one merely limiting the manner in which the prisoners could enjoy their rights to receive and read it.

Accordingly, we hold that Judge Foley quite properly placed the burden on prison officials to demonstrate that the decision to ban the report from inmates at state institutions was necessary to further important penological objectives, and worked no greater a restriction than was necessary under the circumstances. The sole remaining question is whether such a showing was made.

F. *The Standard Applied*

In examining Commissioner Coughlin's testimony and affidavits filed in the district court, we are mindful of the expertise he has derived from years of direct experience working among prisoners. We recognize just how far removed we are from the situs of this dispute. Our sole personal contact with the hard tensions that fuel this and similar controversies comes in the form of

valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty.... [F]reedom to think as you will and speak as you think are means indispensable to the discovery and spread of ... truth....

*Id.* at 375, 47 S.Ct. at 648 (Brandeis, J., concurring).

11. We have stated:

In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections, supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment.

*Wolfish v. Levi,* 573 F.2d 118, 129 (2d Cir.1978), *rev'd sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

arid adversarial debate within the secure walls of a courthouse. For this reason, we scrutinize his evidence with all the deference we, as impartial arbiters, properly can muster.

The Commissioner appears to have placed great emphasis on his argument that the PLS Report is replete with unsubstantiated allegations in the guise of facts. On cross-examination, however, he was forced to concede that most, if not all, of the objectionable passages were in fact introduced by language making clear that PLS was merely repeating charges it had heard. Our reading of the Report confirms this. Thus, although the Commissioner's argument might in some instances serve to justify censorship of an incoming document,[12] it simply does not survive close scrutiny in this case.

Next, the Commissioner alleged that the PLS Report was different from earlier reports that had been allowed into the prisons, and that the distinctions militated in favor of censoring this particular document. In light of his vigorous attacks against the earlier reports, however, this claim rings somewhat hollow. Judge Foley had ample cause to adopt the Magistrate's finding that the PLS Report "is no more critical of prison conditions and administration than earlier reports and articles which inmates have been permitted to receive." J.A. at 10. Yet, each of these two earlier reports was delivered to inmates of maximum-security prisons "without adverse effect on security interests." *Id.*

This last finding was vigorously contested by Commissioner Coughlin in the court below. We are convinced that there existed ample support for the finding. The Commissioner testified that introduction of reports critical of prison conditions have, in the past, played a role in creating disturbances. When asked to detail this causal link, however, he was completely unable to do so. No official log books, incident reports or other documentation was introduced to show that such a cause and effect relationship had ever existed in the past. We recognize that breaches of prison security often result from the confluence of many factors, and we do not demand of prison officials that they produce evidence providing beyond a reasonable doubt that a particular factor will result in an insurrection. But before we condone a bald restriction on prisoners' first amendment rights, there must be some showing that the material is of a type that poses a threat to prison order. If it cannot be demonstrated (in even an attenuated manner) that similar material has resulted in disorder in the past, such a showing will be more difficult to make.

Finally, the Commissioner sought to introduce evidence linking PLS to the sit-in strike that had occurred earlier in 1983. We find this line of argument wholly irrelevant, and affirm Judge Foley's decision to exclude such evidence.[13] Even if it were shown that PLS was somehow involved in the earlier disruption,[14] this evidence would be relevant only to the extent manifested in the contents of the Report. We have never allowed the character of a speaker, or the speaker's intent, to play a role in determining whether a given speech may be censored, and refuse to do so today.

For similar reasons, we are not persuaded by Commissioner Coughlin's argument that charges leveled by PLS are likely to be afforded greater weight than similar charges made by a less reputable organization. Allowing the high standing of a speaker to lessen the showing necessary

12. It is not clear precisely why the characterization of opinion or allegation as fact would tend to make a communication more dangerous than it might otherwise be. If the PLS Report contained nothing more than rumors that were already rampant in the prison, it is not manifest that the further dissemination of that information by means of the Report would pose any threat.

13. Similarly, we affirm his decision to strike those portions of the state's affidavits and briefs dealing with the alleged connection between PLS and the earlier work stoppage.

14. Needless to say, we express no opinion whatever on this question.

to censor his words would be a perverse result, indeed.

If Commissioner Coughlin's arguments regarding PLS are relevant at all, it is only because they are symptomatic of some possible animosity between his administration and that organization. Judge Foley was undoubtedly cognizant of this, as well. We can certainly understand the Commissioner's irritation at the constant criticisms and legal actions directed at him by PLS, but would point out that such adversarial conduct plays an important role in protecting the rights of prisoners. If, and to the extent the Commissioner's anger resulted in his decision to ban the PLS Report from the state's prisons, that determination cannot be allowed to stand.

Finally, we note that Commissioner Coughlin did not apply the guidelines set forth in Directive 4572, and that our review of his decision might have been very different had it been reached by reference to those standards. The DOCS guidelines provide corrections officials great leeway in determining what literature will be permitted into prison facilities, yet assure that each decision represents the consensus of a number of penological professionals, rather than the bias or animosity of a particular official. Our review of the guidelines contained in DOCS 4572, *see Morgan v. LaVallee*, 526 F.2d 221 (2d Cir.1975), suggests that a decision reached by reference to their substantive and procedural guidelines will be afforded great deference by a reviewing court. Where a corrections official chooses to ignore established standards and procedures, however, he must be prepared to demonstrate that his decision—reached in consultation with no one, and made in reliance on no more than his personal beliefs—is supported by reasonable justification.

## III. CONCLUSION

We reaffirm today that the right of a prisoner to receive information sent to him is protectable under the first amendment, and is not inherently inconsistent with established penological objectives. We do not believe that, in the broad sweep of cases, the reading of material thus received poses a presumptive risk to the safe and orderly administration of our prisons. On the contrary, we have noted that reading a wide range of material is more likely to further the penological objective of rehabilitation. We find that Commissioner Coughlin's refusal to permit delivery of the PLS Report to inmates in New York's prisons served to deprive them of, rather than limit their exercise of, their protected first amendment right. Accordingly, we hold that the burden falls to the Commissioner to demonstrate that his refusal to allow delivery of the document was necessary to further an important penological interest.

After examining the evidence adduced below, we affirm Judge Foley's finding that no such showing was made.[15] Accordingly, the order of the district court enjoining the Commissioner and other corrections officials from further interference with the delivery of the PLS Report to prisoners in New York State prison facilities is affirmed.

## APPENDIX A

### ATTICA: A REPORT ON CONDITIONS, 1983

*Introduction*

Having witnessed deteriorating conditions at Attica Correctional Facility since 1976, the staff of the Buffalo Office of Prisoners' Legal Services of New York was not surprised that those conditions finally moved the inmates to take concerted action on September 19, 1983. Seventeen hundred of twenty-two hundred inmates confined there began a general strike on that date by refusing to leave their cells to attend work, classes, meals, recreation or

15. Judge Foley found, and we agree, that the result would be "the same as to whether the burden of showing detriment to penological objectives is placed upon the [prison officials] under *Procunier* or upon the [inmates] under *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119 [97 S.Ct. 2532, 53 L.Ed.2d 629] (1977)." 596 F.Supp. at 1068.

other scheduled activities.[1] It is clear that the strike, which remained peaceful for its duration, was not an impulsive reaction to an isolated incident. Rather, it was a deliberate, controlled attempt to change the deplorable conditions at Attica after attempts to work through the grievance processes failed. As expressed in their letter to the general public dated September 15, 1983,[2] the inmates hoped a peaceful public protest would be far more likely to produce fruitful discussions and critically needed changes than a violent outbreak.

Officials at the Department of Correctional Services [the Department] and at Attica, from Commissioner Thomas Coughlin and Superintendent Harold J. Smith down through the chain of command, should not have been surprised by the inmates' action either. Over the past few years, they have received countless complaint letters from inmates, their legal representatives, and other groups and individuals. They, as well as we, knew what the major problems at Attica were before the general strike, and were fully aware that the conditions have been worsening steadily over the last few years. Even so, it would be difficult for administrators in the Department or Attica to point to significant improvements in the most serious conditions prior to the strike.

If strike-breaking is a measure of success, Attica officials can pat themselves on their backs. Throughout the action, those in charge focused their attention and energies on breaking the strike and identifying the leaders.[3] By transferring over a hundred inmates to other facilities, keeping hundreds of other inmates locked in their cells, and driving inmates around in buses for twenty-four hours straight, the administration accomplished its goal.

To the extent Attica administrators have a public responsibility to address and ameliorate the serious problems at Attica, they have failed miserably. Although Superintendent Smith met with leaders of various inmate groups during the early stages of the strike to discuss conditions of which he was already well aware, those meetings, according to the Department, broke off in a few days.

The purpose of this report is threefold. First, it is important to emphasize that the conditions over which the inmates struck are not new. Over the last few years, we have received an increasing number of complaints about the deteriorating conditions at Attica. Superintendent Smith, Commissioner Coughlin, the Commission of Correction, and others have received these complaints as well. That a general strike to protest conditions was considered necessary by the majority of inmates at Attica reflects, in large part, Attica officials' failure to deal with these problems earlier.

Second, the public's primary source of information about the conditions at Attica, to date, has been the Department of Correctional Services.[4] Although letters from striking inmates have been sent to the press, the exclusion of reporters from Attica until recently forced them to rely almost

1. Though their numbers dwindled as the strike wore on, more than one thousand inmates participated for the next several days.

2. Letter from "Attica Inmate Population" to "Whom it May Concern," dated September 15, 1983.

3. Department of Correctional Services' spokesperson Lou Ganim more than once proclaimed that inmate leaders did not reveal themselves because they were afraid to be transferred from Attica. This unsupportable comment reflects the Department's keen refusal to focus on the real issues. The protest occurred because the conditions at Attica are reprehensible. Virtually every inmate we interview tells us he would rather be anywhere but Attica. Had coming forward as a leader assured one's transfer, no doubt there would have been no shortage of inmates willing to assume responsibility for the strike. More likely, inmate leaders did not come forward due to the real possibility of retaliation.

4. The Correctional Association of New York's report, entitled *Attica 1982: An Analysis of Current Conditions in New York State Prisons,* is a valuable and accurate critique of the conditions at Attica. However, the author of the report was not permitted to interview inmates to develop a more detailed description of the existing conditions.

exclusively on information from the Department for details about the strike and underlying conditions. The public should hear the inmates' version as we at Prisoners' Legal Services have heard it. As a legal services office, we are in a unique position to describe in some detail several of the major problems at Attica. More than 1300 complaints are sent to the Buffalo office each year; we speak with over 50 Attica inmates a month.

Finally, and most importantly, the publication of this report is unabashedly intended to focus public attention on the conditions at Attica Correctional Facility in order to prompt the Department of Correctional Services to remedy them as soon as possible. The Department has concentrated public attention on its handling of the strike. More important to the 2200 inmates at Attica Correctional Facility than the strike itself are the conditions which led to the strike. The public should be made aware that the conditions at Attica remain the same despite the protest, and that only substantial, immediate changes will prevent more drastic actions in the future.

It must be pointed out that this report merely sketches some of the most odious conditions at Attica; it does not purport to be an exhaustive study of everything that is wrong there. Because statistics can be misleading, this report does not list the number of complaints we receive about each area we describe. Lastly, because of the attorney-client privilege, we do not divulge clients' names.

## Conditions at Attica Correctional Facility

It is both popular and convenient for government officials to attribute the problems in the New York State correctional system in general, and Attica Correctional Facility in particular, to prison overcrowding.[5] Despite the Department of Correctional Services' well publicized pleas for more prisons to "solve" the problems, it remains the case that there has never been a need to confine more than one inmate to a cell. From our perspective, overcrowding is a mischaracterization of the situation.

Rather, the most flagrant problems at Attica can be defined within two categories: the negative attitude exhibited by Attica officials towards the inmates in their charge, and the failure to provide adequate resources. Dividing the problems into two general classes is a rough means of description, for these two areas are inextricably intertwined. For example, the impact of the lack of resources on the inmate population is aggravated by the many ways the administration and correction staff manifest their negative attitude towards the inmates. Similarly, providing more resources to the Attica inmates will not substantially alleviate the problems unless major steps are also taken to improve relationships between the administration and inmates.

Nonetheless, categorizing the problems at Attica in this manner is useful to highlight the conditions that warrant immediate redress. The conditions outlined in this report can be corrected without erecting expensive new prisons. Rather, the conditions can be improved in a more cost-effective manner by implementing aggressive policies to eradicate the negative attitudes and resulting conduct, and by providing sufficient resources to make the inmates' confinement liveable. The latter alternative is the course the Department of Correctional Services has thus far refused to follow.

### I. *Negative Attitude of Attica Administrators*

#### A. *Racism*

One serious problem must be addressed at the outset: that of racism. Although racism and its manifestations defy easy categorization, they cannot be ignored. Racism permeates the atmosphere at Attica, and leads to an increase in tension and

5. Coughlin, Thomas A., *A Reply to the Correctional Association of New York,* September 1982, page 4; *Buffalo Evening News,* October 6, 1982, page 1.

unrest, thereby exacerbating other problems. Curtailing the racist attitudes and behavior of Attica's administrative and security staff is unquestionably a difficult task, especially in an insular setting where the inmate population is predominantly black and Hispanic, while the administration and security staff are overwhelmingly white. Nonetheless, the problem must be confronted if others are to be alleviated.[6]

Racism surfaces daily in racist acts against inmates at Attica. Derisive racial remarks, threats on the lives of "black niggers" and "white nigger-lovers," and other forms of harassment by correction officers abound. One Rastafarian inmate, about whom a Prisoners' Legal Services attorney wrote to several investigatory agencies, informed us that correction officers not only subjected him to threatening racist insults, but one guard cut off his dreadlock with a scissors saying, "I'm going to take this for a souvenir." According to several inmates, the correction officer then took the dreadlock back to the inmate's cellblock to demonstrate to other inmates what could happen to them.

We received reports from various sources that on at least two occasions this past year, correction officers roamed the galleries of the Special Housing Unit[7] with white sheets over their heads in the early morning hours, chanting racist slogans. We have heard accounts of similar incidents in Attica's A–Block.[8] This fall, a correction officer handed an inmate in the Special Housing Unit a book entitled *"The Black Book,"* a book about black history. Inside, inmates' names had been handwritten onto photographs of lynched black men and African tribesmen. An example of the doctored photographs is attached to this report.

Allegations of racist conduct arise most frequently in certain areas of Attica: the Special Housing Unit, A–Block, and the Protective Custody Unit.[9] And, not coincidentally, the names of certain correction officers appear time and again in connection with allegations of racist conduct. One of the more frequently named correction officers who was assigned to A–Block was recently reassigned to the Special Housing Unit. According to a conversation between Superintendent Smith and a Prisoners' Legal Services attorney, this correction officer was transferred to the Special Housing Unit after many complaints about his behavior in A–Block. Since his arrival at the Special Housing Unit, this correction officer has been accused of instigating a number of physical assaults and incidents of racist harassment. There is no indication that this correction officer has ever been disciplined for his behavior.

Notwithstanding the frequency with which racist acts occur, one would be hard-pressed to find anyone in authority who has taken all steps necessary to discipline the perpetrators of such acts. A review of the complaints arising out of Attica leads to the overwhelming impression that racist conduct is tolerated, if not condoned, by the Attica administration. As an example of the casual treatment of these incidents, a Prisoners' Legal Services attorney complained to the Superintendent that he saw a correction officer carrying a nightstick with the words "buck bat" carved into the head. As the attorney explained in his letter, the word "buck" is a commonly known derogatory term for an Afro-American man. In response, Superintendent

6. As with other institutional problems discussed in this report, racism was noted as an "undeniable factor among the tensions leading to the [1971 Attica] uprising" by *The Official Report of the New York State Special Commission on Attica* (New York: Bantam Books, September 1972), pp. 79–82.

7. The Special Housing Unit is a separate cellblock which confines inmates charged with violating inmate rules. *See infra,* pp. 1040–1042.

8. Conditions on A-Block are particularly serious and are described more fully *infra,* pp. 1042–1043.

9. The Protective Custody Unit is used to house inmates who have enemies in the general population or who for other reasons, cannot safely commingle with inmates in the general population.

Smith offered the explanation that "buck" was the correction officer's nickname, and noted cryptically that, "The stick was disposed of and you will no longer see it around here." If Superintendent Smith was troubled that the atmosphere in the prison was such that the correction officer apparently felt comfortable with that racist inscription on his nightstick, he did not express that concern to us.

B. *Administrative Indifference Towards Inmate Grievances*

Closely connected to the prevalence of racist conduct by correction officers, and just as difficult to categorize, is the indifferent attitude exhibited by Attica's administration towards inmate grievances. As superintendent of a correctional facility as large as Attica, Harold J. Smith cannot solve the problems of every inmate who writes to him for relief.[10] Nevertheless, our office is aware of many instances where, after inmates have properly brought legitimate complaints to his attention, Superintendent Smith sends them terse answers which do not address the issues raised. In response to complaints about guard brutality and harassment, Superintendent Smith does not conduct in-depth investigations of the incidents. On the contrary, he often responds that he has discussed the matter with the correction officer in question, who denied the charges. On other occasions, he replies with a general statement to the effect that his correction officers do not harass or assault inmates.

This indifferent attitude and lack of responsiveness to the legitimate complaints of inmates, particularly with respect to the sensitive area of guard harassment and brutality, only increases the frustration and anxiety of inmates who have no other recourse for dealing with their problems.

C. *Special Housing Unit*

Attica's Special Housing Unit, which at any given time houses between 75 and 90 inmates, is one of Attica's smaller sections. Yet the conditions there are some of the most brutal within the entire facility.

Briefly, the Special Housing Unit is comprised of cells used to confine inmates who have been charged with and/or found guilty of violations of inmate rules. The general public may recognize the Special Housing Unit as the solitary confinement unit, while those familiar with the New York State correctional system refer to it as "the box." At the present time, all box cells are located on the second and third floors of Attica's "Reception Building," which is a structure set apart from the main facility by fences.

Inmates confined to the Special Housing Unit are locked in their cells 23 hours every day. They are permitted to leave their cells for one hour of exercise a day, for a shower once a week, and for visits from attorneys, family and friends. At Attica, inmates are handcuffed virtually every time they leave their cells.[11]

According to statewide regulations, inmates can be, and often are, placed in the Special Housing Unit as soon as they are charged with violating an inmate rule, such as failing to obey the direct order of a correction officer. Every inmate so charged is entitled to a disciplinary hearing, but the inmate often spends several days in the box before the hearing is completed. These hearings bear very little resemblance to other types of federal or state administrative hearings. The inmate has neither an attorney nor a lay representative to assist him at the hearing. The inmate may call his own witnesses, but his

10. In fact, many types of individual complaints are within the initial purview of the Inmate Grievance Committee, though the Superintendent can, and often does, reject the Committee's decision. It must be observed, however, that the inmate grievance process at Attica is woefully slow and ineffective. The inadequate procedures are presently the subject of a class action lawsuit. *See Ode v. Smith,* Wyoming County, Index No. 10,132.

11. Unlike inmates at other facilities, Attica's box inmates are always handcuffed, often behind their backs, whenever they meet with their attorneys.

confinement from the moment he is charged prevents him from talking to his witnesses before the hearing. Attica officials do not allow an inmate confined to the Special Housing Unit to be present when his own witnesses are being interviewed. In most cases, the only evidence introduced against the inmate at the "hearing" is the Misbehavior Report, a handwritten, unsworn statement describing the inmate's alleged misbehavior, signed by a correction officer, who may or may not have witnessed the alleged incident.[12]

Not surprisingly, it appears that inmates who are handed Misbehavior Reports are rarely found not guilty. Based on the hundreds of disciplinary hearings reviewed by Prisoners' Legal Services staff and Wyoming County-Attica Legal Aid attorneys, it is abundantly clear that the disciplinary hearings conducted at Attica Correctional Facility amount to little more than a vacuous mechanism used by Attica officials to ratify actions by correction officers.[13]

1. *Physical Abuse in the Special Housing Unit*

Hardly a week passes that we do not receive letters about at least one inmate who was physically assaulted by correction officers either as he was escorted to the Special Housing Unit or, if he was already a box resident, on his way back from the exercise cell, visiting room, or shower. These men are often handcuffed when the assaults occur. Frequently, we hear about assaults from other inmates who witnessed them. Although we are usually unable to interview inmates until several days after they were beaten, the physical effects are, more often than not, still evident.

Ironically, we have found that after an inmate is assaulted, he inevitably will be charged with assaulting a correction officer, based on the Misbehavior Reports filed by one or two officers. The inmate will invariably be found guilty even when several other eyewitnesses testify that the alleged assault did not occur.

Over the years, our office has complained to Superintendent Smith, Commissioner Coughlin, the New York Commission of Correction, the Federal Bureau of Investigation, the United States Department of Justice and other agencies about the brutality against the inmates. We have yet to be informed of an investigation which raises any questions about the violence in the Special Housing Unit, let alone suggests that any wrongdoing may have occurred. Nonetheless, based on the similarity of the incidents we investigate, their frequency, the fact that the same correction officers are often named as responsible for different assaults, and our own observations of the physical injuries of our clients, we do not doubt that physical assaults by guards on inmates in the Special Housing Unit occur at a frightening rate, and that they comprise one of the most disturbing problems at Attica.

During the strike, inmates being escorted to the Special Housing Unit often were videotaped as they were led to their box cells. While this videotaping, controlled by correction officers with handheld cameras, seemed to reduce the number of assaults, we have received reports that some inmates were beaten after the cameras were turned off and removed.

The continued use of the cameras in these circumstances should certainly be encouraged. To be truly effective in reducing violence, however, the cameras should also be operated automatically on each floor, and in the elevator and stairwells

12. Attica's interpretation and application of the recently promulgated procedures have been challenged successfully in Wyoming County Court. Attica officials have appealed. *See Jones v. Smith* [120 Misc.2d 445], 466 N.Y.S.2d 175 (Wyoming County 1983). Despite this and other courts' numerous rulings, Attica officials continue to refuse to produce witnesses to testify against the inmates.

13. A great many disciplinary hearing dispositions are reversed in court. However, by the time the arduous procedures are completed and the court issues a decision, an inmate has often already spent a minimum of five months in the box.

leading up to the box, around the clock, and should be used to videotape inmates moving to and from the exercise room, visiting room, and showers.

2. *Strip Cells*

The Department of Correctional Services has promulgated regulations strictly circumscribing the use of a "strip cell," that is, an empty cell without a mattress, blanket, sheet, towel, lights, or hygienic items such as soap, toilet paper, or toothbrush, where a naked or partially clothed inmate is kept.[14] In complete disregard of the regulations, inmates brought to the box for disciplinary purposes are often put naked into strip cells for anywhere from several hours to several days. Confining inmates who are brought to the box for disciplinary purposes into strip cells appears to be a frequent practice at Attica.

3. *Plexiglass Cells*

Though not unique to Attica, there are more plexiglass-enclosed Special Housing Unit cells at Attica than at any other New York State correctional facility. Thick plexiglass panels cover the entire fronts of 52 of the otherwise windowless, steelwalled Special Housing Unit cells. Inmates confined to the "glass" cells insist that inadequate ventilation and the lack of air circulation make breathing difficult, particularly for those with asthma and other respiratory ailments. The lack of smoke detectors or sprinkler systems in the "glass" cells presents a serious potential fire hazard. Outside observers of these cells have noted immediately the total isolation in which an inmate is immersed when confined to a plexiglass covered cell twenty-three hours a day. From outside the cell, an inmate can barely be heard, and not easily seen.

Attica officials originally defended the use of the plexiglass cells as protection against inmates who throw things. The majority of inmates who are placed in these cells, however, have never been accused of or found guilty of throwing items at guards. Yet, Superintendent Smith has expressed his desire to have the plexiglass panels installed on all the Special Housing Unit cells.

On December 23, 1976, Stephen Chinlund, then-Chairman of the State Commission of Correction, wrote a strongly worded letter to Superintendent Smith vehemently protesting the general use of plexiglass cells. He stated:

> It was my understanding from former Deputy Commissioner Quick that cells with plastic covering over the doors were to be used only for inmates who have thrown food, urine or feces out of their cells at officers. I cannot justify their use on any other basis.

Although we do not know what Superintendent Smith's response to Chairman Chinlund's letter was, we know that 49 cells were covered with plexiglass within the last three years. On October 7, 1982, a letter was sent to the Commission of Correction requesting a clarification of its earlier policy in light of the increased use of plexiglass cells. Cecil Seaberry of the Regulatory Review Bureau and James Gleason, Assistant Director of the Commission, replied that the Commission is not opposed to the use of plexiglass cells. They did not explain why the Commission reversed its earlier position.

4. *Lack of Exercise Facilities*

Each inmate confined to the Special Housing Unit is entitled to one hour in the outdoor "exercise room" a day. In reality, the "exercise room" is a euphemism for what is more accurately described as a small, empty, 4-sided, concrete structure, covered on the top by iron bars. There is no barrier to prevent rain from falling in. Snow accumulates in the winter as it falls between the bars. At such times, even the minimal amount of exercise which might otherwise be done in this small, empty room is impossible.

D. *A-Block*

Approximately 460 inmates live in A-Block in the Attica Correctional Facility.

14. 7 N.Y.C.R.R. §§ 301.3, 301.7.

Although classified as general population inmates, many are idle, meaning they have not yet been placed in a job or educational program.

A-Block is infamous for its explosive and dangerous living conditions. The links between inmate idleness and the potential for violence are well known. Even so, it would be too simple to attribute the egregious problems in A-Block to the fact that many inmates are idle. A review of the conditions in A-Block reveals that they are in large measure caused by the attitude and conduct of some of the guards assigned there.

In 1977, the New York State Commission of Correction wrote a report about A-Block, entitled *An Abuse of Authority at the Attica Correctional Facility.* The report described a specific incident during which force was used to subdue an inmate, and stated that had the two officers involved acted differently, they very probably could have resolved the incident without using force. By examining Use of Force Reports, and interviewing both inmates and correction officers, the Commission found that the same two officers were involved in an unusually large number of incidents where force was used. According to the correction officers interviewed, these two officers were "instigators, causing other officers to follow their lead." They also stated that these two officers harassed inmates going to disciplinary hearings and "do not try to hide their antagonistic feelings towards Blacks."[15]

In 1979, Arthur Giacalone, then-Managing Attorney of the Buffalo Office of Prisoners' Legal Services, wrote to the Chairman of the Commission of Correction and to Superintendent Harold J. Smith about the persistent brutality and harassment occurring in Attica's A-Block. Mr. Giacalone included a representative sample of complaints, and detailed four incidents in which correction officers physically assaulted inmates after they were restrained.

Although an initial response from the Commission indicated "a review [of] the matters" would be forthcoming, an examination of our recent files shows that the problems the Commission of Correction complained of in 1977 and those we complained of in 1979 persist today. Inmates have written seeking help in a situation such as the denial of medicine by correction officers, harassment on the way to disciplinary hearings and the refusal of officers to give them cleaning materials for their cell. They have written of lights being cut off intentionally and being fed improperly or sporadically. And they have written over and over again about brutality and blatant racism. In fact, though the truth of its reputation has never been investigated, A-Block is commonly known as "[Ku Klux] Klan Block."

The names of three correction officers have been mentioned frequently in the complaints about guard brutality, suggesting that there are still a few particular correction officers who instigate the incidents. One of those three officers was recently transferred to the Special Housing Unit, but the other two remain in A-Block.

E. *Local Facility Rules*

The *Buffalo News* reported on October 26, 1983 that inmates at Attica frequently complain that each officer at the facility interprets Attica's rulebook differently. The written and oral complaints we receive about this issue support that assessment. Uneven enforcement of the rules is a constant source of irritation for the inmates at Attica.

Part of the problem stems from the large number of rules the inmates must obey. The Department of Correctional Services' rulebook, which is in use at all state prisons, contains 72 rules which must be obeyed. At Attica, inmates are given a supplemental rulebook, containing an additional 157 rules.

A violation of any of these rules can result in a Misbehavior Report, disciplinary hearing, and punishment. Because of the

15. Gleason, J. and Pelagalli, P., *An Abuse of Authority at the Attica Correctional Facility* (Report issued by State Commission of Correction, April 20, 1977), p. 5.

large number of transfers of inmates in and out of Attica, we continually hear from clients who cannot understand why they have been punished at Attica for conduct which was acceptable at other state institutions. For example, at other facilities, inmates may talk, smoke, and put their hands in their pockets as they walk through the halls. At Attica, however, inmates may be punished for any of these acts. At the same time, inmates who have been at Attica for longer complain that newer correction officers who are not familiar with all the rules in the Attica rulebook misapply them.[16]

As a result of the large number of Attica rules and their uneven application, many of the rules are thought by inmates to be silly and designed only for harassment. The most criticized rule is the one which requires inmates to stand twice a day for the daily count. This rule is peculiar to Attica. At all other state facilities, the count is taken by officers who walk past the cells and look in on inmates. At Attica, inmates are required to stand and to turn on the lights in their cells during this process. The Superintendent of Attica has justified this requirement by stating that it is necessary for the officers to see if any inmates are sick when they take the count. Yet, we have heard that inmates have been punished when they were unable to stand because of illness, or because of religious obligations dictating prayer in a kneeling position at the time of the count.[17]

## II. *Lack of Adequate Resources*

### A. *Idleness*

Approximately 400 inmates are in "idle" status and approximately 150 inmates are in "classification" status at Attica. Being in "idle" status means that although an inmate is a member of Attica's general population, he is not assigned to any vocational, educational, or other type of program. Simply put, there is nothing productive for an idle inmate to do all day. Most inmates on idle status are allowed out of their cells for meals and can take a few hours of recreation (1 and ½ hours in the winter and 4 to 5 hours in the summer) each day. The rest of the time, idle inmates are locked in their cells.

Inmates in "classification" status are those who are just entering the state prison system, either as new offenders or as parole violators. After being evaluated and classified, a process which often takes eight weeks, some of these inmates will be transferred to other prisons while some will stay at Attica. Classification inmates are allowed 1 to 1 and ½ hours of recreation a day. They are locked in their cells for the remainder of each day, even during meals.

Although idle and classification inmates spend nearly as much time locked in their cells as inmates in the Special Housing Unit, none has been charged with misbehavior. Yet inmates in both groups are forced to remain in their cells day after day, only because there are not enough programs available, often for months at a time.[18]

Additionally, an assignment on paper which takes a particular inmate out of the idle category may, in fact, be a mere illusion. For example, inmates have reported

16. The arbitrary and erratic enforcement of a myriad of local regulations by correction officers, many of whom were new and unfamiliar with the rules, was noted by the New York State Special Commission on Attica as one of the major problems at Attica prior to the 1971 uprising. *Attica: The Official Report* (New York: Bantam Books, September 1972), pp. 74–75.

17. Superintendent Smith implemented the standing count and the no talking in the hall rules in 1980. These rules had been two of several local rules in effect at Attica prior to the 1971 uprising which the New York State Special Commission on Attica characterized as "senseless, juvenile, and serv[ing] no purpose." *Attica: The Official Report* (New York: Bantam Books, 1972), pp. 75–76.

18. Commissioner Coughlin has acknowledged that, "The Department is no longer engaged in rehabilitation programming efforts; but rather it is forced to warehouse people and concentrate only on finding the next cell." Affidavit submitted in *Benjamin v. Malcolm,* 75 Civ. 3773 (S.D.N.Y.).

that although they are classed as porters, they work outside their cells at most one or two hours per day.

There is no doubt that at present, program space is cramped. There is, however, room on the grounds at Attica for modular classrooms which can be used to conduct various activities, such as academic or vocational training. Commissioner Coughlin has stated that he has not "found any resistance on the part of the legislature or the government to fund what we need. It's not a matter of money." [19] Thus it is clear that it is a question of priorities. The Department of Correctional Services has elected to build new cells instead of ensuring that each inmate has access to a program.[20]

B. *Medical Care*

The quality and quantity of medical care at Attica is one of the areas of concern most frequently addressed by inmates. A review of our cases reveals that the complaints Prisoners' Legal Services receives are occasionally of improper diagnosis, but most often of delayed or missed treatments, inability to see a physician,[21] delayed or missed medical appointments either at Attica or an outside clinic, delayed or never-filled prescriptions for medication, and the failure of paraprofessionals and nursing staff to perform routine daily services.

While some delays and scheduling difficulties are to be expected in any institutional setting, the number and regularity of complaints at Attica point to a serious lapse in services. The lack of treatment by health care specialists is a major problem area. Many of our clients are in need of specialized health care, either because of a diagnostic referral by the facility physician or because of an ongoing medical condition. Because the prison does not devote sufficient resources to bringing specialists into the facility for visits, the vast majority of inmates requiring sophisticated medical care must be transported to the Erie County Medical Center in Buffalo, 40 miles from Attica.

Despite the great need for transportation, Attica uses only two vans a day for trips to the Medical Center. Only two inmates at one time can be transported in each van, unless the inmate is serving a life sentence, in which case that inmate is taken alone. Because of this system, extreme delays in being able to see a doctor for initial and follow-up care result.[22]

One of our clients experienced just such a delay after he was assaulted by another inmate at the facility. Our client suffered a head injury and was subsequently hospitalized at Attica for nine days. During this time, he was placed on the waiting list to see a specialist at the Medical Center. Despite the acknowledged need in this case for an outside consultation, he was not taken to the Medical Center for four months. In the interim, he reported on sick call approximately twenty-seven times and complained of dizziness, blackouts, seizures, and a burning and ringing sensation inside his ear. On several occasions during this time, he had seizures inside his cell to which the medical personnel did not respond. Our client was subsequently told that the medical staff was not notified of these seizures by the officers in charge of his cell block.

This example illustrates as well the low priority that health care is given by the security staff at Attica. We receive many complaints that sick call appointments and

**19.** Pochoda, D., *Attica 1982: An Analysis of Current Conditions in New York State Prisons.* (The Correctional Association of New York, September, 1982), pp. 25–26.

**20.** The Department's choice is in apparent violation of its legislative mandate. *See* N.Y. Correction Law § 136.

**21.** Attica has two staff physicians. One works from 7:30 a.m. to 11:30 a.m., and the other from 12:00 noon to 3:00 p.m. Both work Monday through Friday except on holidays. No doctor is available evenings, at night, or on weekends.

**22.** In contrast, Collins Correctional Facility in Gowanda, New York, which houses 400 inmates, has six vans available to transport inmates to medical appointments.

appointments with outside physicians are cancelled because correction officers will not allow inmates to attend the appointments. When this occurs a notation is placed in the inmate's file indicating that he has refused the appointment. In such cases, the medical staff does not follow up with an interview to determine the cause of the missed appointment. Instead, another appointment is scheduled only when the inmate is able to communicate with the medical staff. The inmate is frequently placed at the bottom of the waiting list, even if he denies that he refused the initial appointment.

Conflicts between health care needs and the security staff arise also in the dispensing of prescribed medications. Although the American Public Health Association recommends that all prescription drugs be administered only by "adequately trained health services personnel,"[23] prescribed medications are dispensed at Attica by correction officers.[24] We receive numerous complaints that these medications, many of which are necessary for the treatment of serious problems, are not dispensed as required by the prescription.

Complaints about inadequate medical care, while voiced throughout the prison population, are particularly acute in Attica's Special Housing Unit. The situation there is one of outright neglect, perhaps because of the attitude taken toward these inmates by both the Attica administration and the correction officers assigned to the Special Housing Unit. Although medical personnel walk through the galleries of the Special Housing Unit several times a week, we have been told repeatedly by our clients that their medical complaints receive, at best, perfunctory attention. Even after inmates submit written notes indicating they are in need of medical attention, medical personnel often do not stop on their rounds to speak to them. Many of the inmates have told us they suspect correction officers in the box often destroy their written requests to see someone on the medical staff rather then deliver them to the health care office.

We have also been told that examinations of box inmates by medical personnel are usually quite brief and frequently consist only of the staff member looking at the patient from a distance through the plexiglass covering of the cell, even when broken bones or dislocations are the complaints. After such an examination, inmates are not seen again unless they constantly complain about the same problem. Because of such treatment, many do not persist since they become apprehensive about the type of care they would receive if they continued to complain.

C. *Visitation*

Visits are extremely important to inmates because of the great benefits which come from contact with loved ones. The opportunities for such visits are relatively few, however, because 60% of the Attica population comes from the New York City metropolitan area. Few inmates' families have the time and money necessary to make the trip to Attica regularly. Thus, every moment spent together is valuable.

Several of the chief problems involving visits to Attica were described in the New York Correctional Association's report, *Attica 1982: An Analysis of Current Conditions in New York State Prisons.* These include extreme delays before visitors are able to get into the visiting room; harassment and strip searches of visitors; and the arbitrary termination of visits. The complaints we have received over the past year about these problems persuades us that none of them has abated.

Prisoners' Legal Services has also received many complaints relating to the severe time delays. We often hear that a visitor has had to wait several hours before being able to start a visit. It is not at all

23. *Standards for Health Services in Correctional Institutions,* Pharmacy Services, No. 5 (An official Report of the American Health Association, 1976).

24. We have also been told that this practice is peculiar to Attica. Apparently, nurses dispense prescription drugs at other correctional facilities in New York.

clear what causes these delays as much of the waiting often occurs even after the visitor has been cleared for admittance.

Additionally, once the visit begins, there is no guarantee that it will not be terminated in short order. Inmates often complain to us that correction officers suddenly end their visits for no apparent reason.

As a result of federal litigation, specific rules were established which spell out the procedures to be followed before a person's visitation rights can be suspended or revoked.[25] By court order, every correctional facility in New York State was required to post these visitation rules and rights in places visible so both visitors and inmates from May 23, 1983 through November 23, 1983. Attorney visits to Attica have revealed that the required notice was never posted there. Without knowledge of the procedures approved in the *Kozlowski* case, many inmates and visitors at Attica will never be in a position to invoke them.

Another time-related problem arises when visiting any inmate housed in the Reception Building, including those men in the Special Housing Unit and Protective Custody. Because of a shift change at 3:00 p.m., visits are terminated just before 3:00 p.m. rather than at 3:30 p.m. as they are for the rest of the population.

D. *Law Library*

A great many of Attica's 2200 inmates use the law library at various times during their stay in prison. The reasons for using the law library are numerous and include research on matters related to their convictions, family matters, property issues, sentencing errors, and on lawsuits challenging prison disciplinary hearings and prison conditions. The non-profit legal organizations servicing inmates at Attica cannot possibly come close to meeting the legal needs of the Attica community. In 1981 alone, nearly 1500 lawsuits initiated by inmates from Attica had been disposed of by the state courts, and 1500 more were pending at the end of the year.[26]

To meet this need, Attica has a law library that seats slightly more than 20 inmates.[27]

In order to gain access to the law library and the single copying machine, inmates must place their names on a lengthy call-out list. They are then supposed to be called in chronological order. Over the past few years, inmates have complained of delays of more than a month in being permitted to visit the library; delays of more than a month in having photocopies made; outdated books and others that lack pocket supplements; damaged books in need of replacement; and a lack of basic materials, including the prison Directives. (On at least one occasion, we sent the library a copy of a Department of Correctional Services Directive).

In late 1982, we received complaints that the correction officer in charge of the law library disregarded the order on the lists when calling inmates for visits and copies, and refused to place the names of certain inmates on the list. Inmates also reported that he was refusing to give inmate law clerks institutional passes which would have enabled them to see other inmates who had requested their help in completing legal papers, and that he was failing to honor the call-out slips signed by certain inmates.

According to one inmate on the Inmate Liaison Committee whom we interviewed, these complaints from inmates prompted an attorney from another legal organization to write a letter to Superintendent Smith about the problems with this officer. Shortly after Mr. Smith received the letter, the two inmate law clerks lost their jobs in the law library.

25. *Kozlowski v. Coughlin*, Stipulation and Settlement, 81 Civ. 5886. (S.D.N.Y. May 13, 1983).

26. These figures do not include actions related to criminal matters, nor do they include the number of lawsuits rejected by the State courts because the inmate was not sufficiently versed in the law to state the necessary facts.

27. Until early November 1983, the law library was open only during the day. It is now open during the evening as well.

On January 19, 1983, we wrote a letter to Richard Fietz, then-Acting Superintendent of Attica Correctional Facility. In that letter, we asked for information about access to the law library and legal assistance for inmates in the general population and Special Housing Unit. Mr. Fietz responded by saying that he would not provide us with any information about the Special Housing Unit because of pending litigation. He ignored the questions related to the inmates in general population.

A related problem stems from the prison's policy concerning inmates who are locked in their cells or confined in the Special Housing Unit. When the library is closed, they can order a limited number of books and keep them for a few hours, but then, must list precisely the books they want. As a practical matter, this severely restricts access to legal materials for persons in those situations. Considering the limited number of books and the large number of inmates wanting to use them, this system cannot work even under ideal conditions.

An additional problem for persons in the Special Housing Unit is the prison's refusal to allow law clerks to visit or assist inmates detained there. This practice denies illiterate persons in the Special Housing Unit access to legal resources and to the courts, since they often cannot complete legal papers on their own.

## Conclusion

Desperate for change in their intolerable living conditions, and frustrated by the failure of state and prison officials to remedy the most critical problems, 1700 inmates at Attica Correctional Facility staged a general strike hoping to move the administration to act. It was, undoubtedly, no coincidence that the action began close to the twelfth anniversary of the violent Attica massacre in 1971. Unlike their predecessors in that catastrophe, however, the inmates on strike in 1983 remained orderly and peaceful, believing that by doing so, improvements in their plight would be more readily forthcoming.

The general strike has ended, but for the most part, the conditions over which the protest occurred have not. As the inmates underscored by their strike, and as this report has demonstrated, the conditions at Attica are severe and ongoing.

The challenge now faced by state and Attica officials is to acknowledge the severity of the conditions at Attica, and to take immediate and decisive steps to correct them.[28] It would be a tragedy of immense proportions if the administration's response is to pretend that the crisis has passed, and to walk away from the fundamental problems. Surely, the painful lesson to be drawn from such a response would be that more than individual grievances or peaceful public protests are necessary to improve the unbearable conditions.

State and Attica officials have been aware of these conditions for as long as the inmates and the staff of Prisoners' Legal Services. The difference between the groups, of course, is that only state and Attica officials have the power to effectuate the critically needed improvements. This they must do, as rapidly as possible.

28. Inmates we have interviewed since the general strike ended have informed us that Superintendent Smith's chief response to the strike thus far, announced by him through the public address system in early November, has been to change the flavor of ice cream available for sale in the commissary.