18-628
*H'Shaka v. O'Gorman, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of February, two thousand nineteen.

Present:
> ROBERT A. KATZMANN,
> *Chief Judge*,
> PETER W. HALL,
> GERARD E. LYNCH,
> *Circuit Judges*.

---

IMHOTEP H'SHAKA,

> *Plaintiff-Appellant*,

> v.                                                          No. 18-628

JAMES O'GORMAN, Acting Deputy Commissioner for Correctional Facilities, Department of Corrections and Community Supervision, MAUREEN BOSCO, Former Executive Director, Central New York Psychiatric Center, DEBORAH MCCULLOCH, Executive Director, Central New York Psychiatric Center, JOANNE WALDRON, Office of Mental Health Unit Chief, Clinton Correctional Facility, JOSEPH PORCELLI, Offender Rehabilitation Coordinator, Clinton Correctional Facility, KEVIN RANDALL, Sergeant, Clinton Correctional Facility, DAVID LUCIA, Acting Deputy Superintendent of Security, Clinton Correctional Facility, JUSTIN D. DELISLE, Sergeant, Clinton Correctional Facility, JOSEPH

1

BELLNIER, Former Deputy Commissioner for Correctional Facilities, Department of Corrections and Community Supervision,

*Defendants-Appellees.*

_____

| For Plaintiff-Appellant: | MICHAEL E. CASSIDY, Prisoners' Legal Services of New York, Plattsburgh, NY, Alissa R. Hull, Prisoners' Legal Services of New York, Ithaca, NY, John W. Brewer and Steven G. Storch, Storch Amini PC, New York, NY. |
| --- | --- |
| For Defendants-Appellees: | BRIAN D. GINSBERG, Assistant Solicitor General, and Andrea Oser, Deputy Solicitor General, *for* Letitia James, Attorney General for the State of New York. |

Appeal from a judgment of the United States District Court for the Northern District of New York (Suddaby, *C.J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the lower court is **AFFIRMED**.

Plaintiff-appellant Imhotep H'Shaka appeals the district court's denial of his motion for a preliminary injunction. H'Shaka has been in administrative segregation since November 2010 because prison officials have consistently found, or purported to find, that his release to the general population or even to an intermediate, "step-down" program would threaten prison security. As relevant to this appeal, H'Shaka argues that the prison officials did not meaningfully review his segregated status and thus denied him due process under our decision in *Proctor v. LeClaire*, 846 F.3d 597 (2d Cir. 2017). Given the very limited record and doubly-demanding standard of review of the district court's denial of this mandatory preliminary injunction, we affirm. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

2

H'Shaka was born in 1972. He was incarcerated at juvenile facilities on and off for several years in his youth, where he committed several acts of violence, including against guards. Just before he turned 18, he shot and killed a man for unknown reasons. H'Shaka was convicted of murder and sentenced to a term of incarceration of 25 years to life. H'Shaka's prison records show over twenty violations of prison rules from 1991 to 1995, including fighting, possessing a weapon, and assaulting other inmates. Several violations led to disciplinary confinement alone in his cell ("keeplock") or alone in the prison's special housing unit ("SHU"). In early 1996, H'Shaka attacked a corrections officer with a razor blade, severely slashing his face. He was convicted of assault and sentenced to 15 years' imprisonment, to be served consecutively to his prior sentence, and given a disciplinary penalty that included 12 years' confinement in SHU. H'Shaka's disciplinary records show four assaults between January 1996 and April 1999, while he was in SHU. In April 1999, during a court proceeding related to a civil lawsuit, H'Shaka attacked another inmate and bolted for the door, although he was tackled before he made it very far. H'Shaka was then 26 years old.

Since April 1999, H'Shaka has not received a single citation for violent or threatening behavior. His disciplinary SHU term was reduced for good behavior in 2009 and again in 2010, so his disciplinary segregation ended on November 1, 2010. But H'Shaka did not leave SHU on November 1, 2010. Instead, he stayed under "administrative segregation"—solitary confinement for inmates whose "presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b). He remains there today.

H'Shaka is now 46 years old and over 20 years removed from his last violent incident. For the last 22 years, he has been alone in a nine by eleven cell for 23 hours a day, 365 days a year. H'Shaka cannot access group recreation, education, worship, therapy, or meals. He is

allowed one fifteen-minute phone call per month.[1] He goes outside for just one hour a day, where he is put in another nine by eleven cage, this one made of chain fencing. There is nothing in the cage but a concrete floor.

In January 2017, H'Shaka filed a complaint against various New York State Department of Corrections and Community Supervision ("DOCCS") officials under 42 U.S.C. § 1983, challenging the constitutionality of his continued administrative segregation. H'Shaka claimed that the conditions of his confinement were cruel and unusual and imposed without due process. On September 7, 2017, H'Shaka moved to preliminarily enjoin defendants from continuing his administrative segregation, but only under his due process theory. The district court denied that motion on February 9, 2018. This timely appeal followed.

We review a district court's denial of a preliminary injunction for abuse of discretion, reversing only if the decision rests on an error of law or clearly erroneous finding of fact. *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis*

_____

[1] In February 2012, H'Shaka was enrolled in the "Pilot Incentive Program," through which he could earn extra benefits by behaving well. During the program, H'Shaka was allowed one thirty-minute phone call per week, two hours of television every Sunday, and two hours outside instead of one. This program ended in 2017.

4

*PLC*, 787 F.3d 638, 650 (2d Cir. 2015).[2] An injunction that would change the status quo is even more extraordinary, and parties seeking these so-called "mandatory" injunctions must show either a clear likelihood of success on the merits or, perhaps, that the balance of hardships tips even more decidedly in their favor because "extreme or very serious damage will result from a denial of preliminary relief." *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

H'Shaka thus bears a doubly heavy burden on this preliminary appeal: He can only succeed if he shows that the district court *clearly* erred in its finding that he had not *clearly* shown that he was entitled to a preliminary injunction.

## I.     Likelihood of Success on the Merits

Prisoners in solitary confinement for extended periods must receive "some sort of periodic review" to verify that they "remain[] a security risk." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983). In *Proctor* we enumerated three criteria for that periodic administrative review to satisfy *Hewitt* and the Due Process Clause: The review must (1) meaningfully evaluate, (2) considering recent conduct, (3) whether valid institutional safety reasons justify continued segregation. *Proctor*, 846 F.3d at 610-11. As to the first requirement, prison officials cannot "go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows." *Id.* at 610. Second, the reviewing officials must "evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available." *Id.* at 611. But "[t]his is not to say that prison officials are barred from according significant weight to events that occurred in the past. Neither do we

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred long ago." *Id.* Third, the State "may not use Ad Seg as a charade in the name of prison security to mask indefinite punishment for past transgressions." *Id.*

We also held that "[p]rocedural due process does not permit a court to review the substance of [DOCCS's] decision to confine [a defendant] in Ad Seg. . . . The Due Process Clause permits only an evaluation of whether Defendants' method for coming to their Ad Seg determinations is sufficient." *Id.* at 608. Thus, merely pointing to evidence of recent good behavior is insufficient if defendants can show that they "reviewed and either genuinely discredited [it or] found that [the inmate's] poor behavior outweighed it." *Id.* at 613 n.9.

The record on appeal is sparse. It consists mostly of reports generated roughly every 60 days pursuant to New York law. *See* 7 N.Y.C.R.R. § 301.4. In these reports, representatives from the facility describe the reasons for H'Shaka's segregation and his subsequent behavior and provide any further information they think relevant to the decision of whether to keep him in segregation (the "Facility Committee Report"). More senior DOCCS employees review that report and develop their own recommendation (the "Central Committee Report"), and then the deputy commissioner makes the final decision. *Id.* § 301.4(d)(1)-(3). The record also includes declarations from Kevin Randall, a sergeant who contributes to the Facility Committee Report; Scott Kelly, the Chairman of the Central Office Review Committee; and James O'Gorman, the Acting Deputy Commissioner for Correctional Facilities.

We cannot conclude from this scant evidence that it was an abuse of discretion to find that H'Shaka had not shown a clear likelihood of success on the merits.

First, the outcomes of the reviews may not be preordained. The three decisionmakers each stated in their declarations that they are open to the possibility of releasing H'Shaka and

6

that they believe he is successfully working toward that goal. These decisionmakers have not been cross-examined, so we are in a poor position to judge their credibility at this stage, let alone to second-guess the district court's assessment. Second, the 60-day reports at least suggest that DOCCS did consider H'Shaka's recent behavior, as they discussed both his few infractions as they occurred and his ongoing good behavior and attitude. Third, the reports discuss his extremely violent past in the context of his present danger, which a factfinder could read as suggesting that the reviewers do not seek to punish him for his past conduct. Consideration of past behavior, even long-past behavior, is permissible to determine current dangerousness. *Proctor*, 846 F.3d at 611.

H'Shaka principally contends that the fact that he continues in administrative segregation despite two decades of good behavior is alone sufficient to infer a procedural flaw. That is, only reviewers with pre-determined recommendations based only on his past conduct or who seek to punish him would say that his release to an intermediate, transitional setting would threaten prison security. Defendants concede that the mere fact that an inmate was kept in administrative segregation may sometimes suggest an unconstitutionally infirm process, and further discovery may uncover evidence that would prove to a jury, or indeed to any reasonable jury, that this is such a case. Over the seven years that he has been in administrative segregation, H'Shaka has received five citations. Four led to an actual finding of misconduct, two led to the loss of any privileges (for one or two review cycles), and none appear to have involved violence or threats. H'Shaka went about 18 months, 9 months, 24 months, 15 months, and 14 months between citations, during which time DOCCS consistently praised his behavior.

However, on this limited record, we can only infer the general seriousness of H'Shaka's few offenses; the details remain either disputed or undiscussed. Discovery may reveal that

7

reviewers used these minor infractions as pretext to justify further punitive segregation. But that is not so clear on this record that it was an abuse of discretion to conclude otherwise, particularly given our obligation to review only the process and not the substance of DOCCS's decision.

Next, H'Shaka argues that the 60-day reviews and reviewer declarations indicate that DOCCS is using his good behavior in administrative segregation to justify keeping him there. For example, O'Gorman believes "continuing the type of confinement where inmate H'Shaka successfully follows the rules and behaves appropriately demonstrates appropriate confinement." App. at 478. Likewise, the August and October 2017 reports noted that, while H'Shaka had "not received a disciplinary infraction since April 2015, he has not shown a decline in poor behavior outside the close supervision of administrative segregation." App. at 521, 523. As we held in *Proctor*, "[i]t is hard to understand why . . . *good* behavior, which served as a legitimate basis to reduce his time in the SHU for Disciplinary Segregation, somehow morphed in the context of his Ad Seg determination to indicate that he remained a security risk." *Proctor*, 846 F.3d at 613. Similarly, dismissing "good behavior as irrelevant because the SHU is so restricting that it precludes opportunities for misbehavior is patently circular." *Id.* at 613-14. This "inexplicable logic . . . raises red flags about whether the underlying reviews were conducted genuinely," and "may cause a reasonable jury to question the fulsomeness of their authors' analyses." *Id.*

However, the question now is not whether there is a genuine dispute of material fact. It is whether it is so clear that the challenged reviews were not genuine that it was an abuse of discretion to find otherwise. Even given these troubling circumstances, we cannot reach that conclusion at this stage.

Last, H'Shaka points to DOCCS's consistent failure to finish its 60-day reviews before the next review cycle began. New York law gives inmates the right to submit a statement for

8

reviewers to consider in the next round of reviews. *See* 7 N.Y.C.C.R. § 301.4(d)(4); *Wilkinson v. Austin*, 545 U.S. 209, 225-26 (2005) (upholding a supermax policy because, among other reasons, "an inmate must receive notice of the factual basis leading to consideration for [supermax] placement and a fair opportunity for rebuttal"). But H'Shaka could not provide such statements when DOCCS failed to timely provide him with the reports. This delay is even more notable because reviewers often just cut and pasted large portions of the reports.

However, the most recent reports in the record were completed on time, and there is no evidence regarding the reason for the delays when they did occur. Perhaps the reports were delayed because DOCCS did not take them seriously. But again, that is not so clear on this record that it was an abuse of discretion to conclude otherwise.

On this slim record, the district court did not abuse its discretion in concluding that H'Shaka has not shown a clear likelihood of success.

## II. Extreme or Very Serious Damage Absent an Injunction

Defendants argue that this resolves the appeal because a mandatory injunction can issue only upon a showing of a clear likelihood of success, citing *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 38 n.8 (2d Cir. 2018). H'Shaka counters that he may alternatively show that he will suffer extreme or very serious damage absent an injunction. *See Abdul Wali*, 754 F.2d at 1025. We need not resolve this dispute here. Assuming without deciding that one may receive a mandatory preliminary injunction absent showing a clear likelihood of success in some cases, this is not such a case.

We do not question the well-documented and devastating psychological and physical effects that prolonged isolation can have. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209-10 (2015) (Kennedy, J. concurring); *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017). Nor do we dispute

9

that monetary damages are unlikely to provide an adequate remedy for such harms. But there is nothing in the record that speaks to the specific harms that this specific person will face if he is kept in administrative segregation during the pendency of this litigation. Moreover, we must weigh H'Shaka's potential injury against the damage to defendants and the public welfare should an injunction erroneously issue and H'Shaka, who has an admittedly violent history, be released against the genuine best judgment of DOCCS officials.

## III.    Conclusion

Our decision at this preliminary stage on this limited record does not predict the appropriateness of relief following discovery, trial, or even a renewed motion with a fuller record. Indeed, it does not necessarily reflect how we would have decided this motion had we been sitting as district court judges. H'Shaka has raised serious grounds for concern about the authenticity of defendants' review and the appropriateness of his continued segregation in lieu of even a carefully controlled transition back to the general population. He has done nothing violent for 20 years and prison officials regularly praise his behavior and attitude. The reviewers said in their declarations that they remain open to H'Shaka's transition to a step-down program if his appropriate behavior continues. Defendants also indicated that DOCCS has recently adopted a more flexible policy regarding administrative segregation that has led to the release of other inmates to step-down programs. Assuming this open-mindedness is genuine, this new approach may soon moot this litigation.

We have considered all of H'Shaka's contentions on appeal and have found in them no basis for reversal. For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

10